## Morgan, et al. v. Big Woods Lumber Company.

(Decided January 2, 1923.)

### Appeal from Menifee Circuit Court.

1. Partition—Judgment—Collateral Attack.—A county court, in a proceeding to partition lands is a court of general jurisdiction, and its judgment is immune from collateral attack as the judgment of

any other court of general jurisdiction, and the same presumptions are indulged, in its favor.

2. Evidence—Continuance of Fact or Condition.—Presumptions.—A person, who is once proved to be alive is presumed to continue to live to the ordinary duration of human life and if married to have left issue.

3. Damages—Injury to Land.—Persons owning an undivided interest in land may recover for damages done to the land in proportion to their interests in it.

4. Partition—Actions for Partition.—A partition of land may be made between holders of legal titles and those holding equitable titles, if the equitable title holders are entitled to a present possession.

5. Partition—Parties.—A partition of lands between joint owners is valid, as to those participating in the action for division as against a stranger, although by oversight or mistake a joint owner is not a party, but, the division does not affect the rights of the latter.

6. Champerty and Maintenance—Burden of Proof.—The burden of proving that a contract is vicious under section 211, Ky. Stats., is upon the one asserting its vicious character, as the contract will be presumed to be lawful rather than unlawful.

7. Deeds—Innocent Purchasers—Unrecorded Deeds.—Innocent purchasers of lands under deeds made by heirs will prevail against unrecorded deeds or deed not recorded in proper county, made by an ancestor.

8. Champerty and Maintenance—Adverse Possession.—The same kind of a possession, which, if continued long enough, will ripen into a title by adverse possession, will make a deed to the land by one not in possession champertous and void.

HOBSON & HOBSON, MAURY KEMPER and G. W. GOURLEY for appellants.

LEWIS APPERSON, HAGER & STEWART, B. F. DAY and R. H. WINN for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE HURT—Affirming in part and reversing in part.

The issues which grow out of the facts set forth in this immense record, which contains about four thousand typewritten pages, with briefs and many maps in addition thereto, may be separated into two classes, those which relate to the determination of the question of whether the appellant, the plaintiffs below, have shown a *prima facie* record title to the land upon which the trespasses alleged in the petition were committed, and those which if it be conceded that the plaintiffs show a *prima facie* record title, then to determine the question as to whether or not the plaintiffs have a right to recover—that is, whether the facts relating to the defenses of the defend-

ant entitled it to have committed the alleged trespasses and immunity from their consequences. It will be first determined from the record whether the plaintiffs demonstrated a title to the land on their part or to any part of it, and to do this the facts upon which their alleged title rests and the state of the pleadings will be considered.

On the 4th day of January, 1786, there was granted by the Commonwealth of Virginia to Peter Dominick, or Pierre Dominique Robert, a patent for 18,353 2/3 acres of land which is now situated in the county of Menifee, in the Commonwealth of Kentucky. He died intestate, in what was then and now Fayette county, Kentucky, about the year 1806 or 1807. As may be recognized by the name, he was an immigrant from France. He left surviving him in this country, three sons, whose names, respectively, were Peter John, or Pierre Jean, Baptist; Henry John James and Louis James Dominnque Robert. He also, had a daughter, Mary Elizabeth Katherine Henrietta, who intermarried with and was the wife of one Guidee and who never came to America, but resided in Havre, France. Whether Mrs. Guidee survived her father does not appear. In 1796 or 1797, presumably the elder Robert caused a plat of the land contained or supposed to be embraced within the boundaries of the patent to be laid off into 49 separate lots or boundaries. A copy of the plat, with the figures and letters upon it, is here presented for illustration. What the intention of the elder Robert was with reference to the lands may be gathered in part from the plat, and from his acts thereafter. The plat shows that lots Nos. 3, 4, 5, 11, 24, 25, 33, 32, 38 and 39 were designated by the capital letter "A," and on the margin of the plat following the letter "A" was written the name of Mrs. Guidee. Lots Nos. 2, 9, 10, 20, 19, 18, 35, 34, 36 and 37 were designated by the letter "B." Lots Nos. 1, 8, 12, 21, 17, 16, 15, 22, 23 and 28 were designated by the letter "C." Lots Nos. 6, 7, 13, 14, 26, 27, part of 28, 31, 30, and 29 were designated by the letter "D." Following the letters B, C, D, respectively, on the margin of the plat were written the names of Louis James Dominique Robert, Peter John Baptist Robert and Henry John James Robert. Lots Nos. 40, 41, 42, 49, 48, 47, 46, 45, 44 and 43 were designated on the plat by the letter "R." The elder Robert and his sons at the time of the conveyances hereinafter mentioned resided in Fayette county. In 1800, the elder Robert by deed conveyed to his son, Peter John Baptist Robert, lot No. 1, and on August 9, 1804, he

| | | | | | | |
|---|---|---|---|---|---|---|
| No.1 C. | No.2 B. | No.3 D. | No.4 A. | No.5 A. | No.6 D. | No.7 D. |
| No.8 E. | No.9 B. | No.10 B. | No.11 A. | No.12 C. | No.13 D. | No.14 D. |
| No.21 C | No.20 B. | No.19 B. | No.18 B. | No.17 C. | No.16 C. | No.15 C. |
| No.22 C. | No.23 C. | No.24 A. | No.25 A. | No.26 D. | No.27 D. | No.28 C / D. |
| No.35 D. | No.34 B. | No.33 A. | No.32 A. | No.31 D. | No.30 D. | No.29 D. |
| No.36 B. R. | No.37 B. R. | No.38 A. R. | No.39 A. | No.40 R. | No.41 R. | No.42 R. |
| No.49 R. | No.48 R. | No.47 R. | No.46 R. | No.45 R. | No.44 R. | No.43 R. |

3662 Acres $\left\{\begin{array}{l}1600\\2062\end{array}\right\}$ A. Mary Eliz. Cathe. Henrietta Guidee.

3662 Acres $\left\{\begin{array}{l}2400\\1262\end{array}\right\}$ B. Louis James Dominic Robert.

3662 Acres $\left\{\begin{array}{l}2000\\1662\end{array}\right\}$ C. Peter John B. Robert.

3662 Acres $\left\{\begin{array}{l}2162\\1500\end{array}\right\}$ D Henry John James.          3669—109 $\left\{\begin{array}{l}1852\\1847\end{array}\right\}$

18347—109

6—  1  —42 wanted
                for R.

1853— ⅔

by deed conveyed to him lots Nos. 8, 21, 22, 23, 12, 15, 16, 17 and the northern end of lot No. 28, in all embracing 3,662 acres. In 1804 the elder Robert conveyed by deed to his son, Henry John James, lots Nos. 6, 13, 14, 7, 26, 27, 30, 31, 238 acres of lot No. 28, and 324 acres of lot No. 29, in all 3,662 acres. On August 10, 1804, the elder Robert conveyed by deed to his son, Louis James Dominique, lots Nos. 2, 9, 10, 18, 19, 20, 34, 35 and a part of lots Nos. 36 and 37, embracing in all 3,662 acres. Peter John Baptist Robert executed a mortgage to Patrick Gibson upon the lands conveyed to him by his father, and this mortgage was recorded on August 11, 1812. Thereafter, he executed a deed of assignment for all of his property to Stout, et al., in trust for the payment of various sums of indebtedness, and this deed was recorded on December 4, 1812. Patrick Gibson transferred the benefit of the mortgage to him to John S. Robert in 1821 and this transfer was recorded in the office of the clerk of the Court of Appeals on the third day of August, 1822. On November 18, 1814, Henry John James Robert by deed conveyed to Waldemar Mentelle the lots conveyed to him by his father. On May 13, 1811, Louis James Dominique Robert by deed conveyed to John Baptist Fanchier the above described lots which had been conveyed to him by his father, and Fanchier on August 12, 1815, conveyed lot No. 10 to James R. Brown and on September 14, 1812, he conveyed lots Nos. 2, 9, 18, 19, 20, 34, 35 and parts of lots Nos. 36 and 37 to Mary Cunningham Dumesuil, et al. In the year 1792 the county of Montgomery was created, and that portion of the county of Fayette wherein these lots were situated was included in the county of Montgomery. The deed from the elder Robert to each of his three sons was recorded in Fayette county and not elsewhere, although the lands were then situated in the county of Montgomery. Likewise the deed to Mentelle, the mortgage to Gibson, the deed of assignment to Stout, et al., and the deed to Fanchier were recorded in Fayette county and not elsewhere, although they were all executed and recorded after the creation of Montgomery county. The deeds from Fanchier to Brown and from Fanchier to Dumesuil, et al., were recorded in Montgomery. From the foregoing it may be inferred that the elder Robert caused the lands to be platted with the intention of conveying to his sons the portions which were afterwards conveyed to them by him and to Mrs. Guidee the lots designated by the letter "A," but what his purpose was with reference to the lots designated by

the letter "R" is scarcely conjectural. Whatever his purpose was, he never made any conveyance to any one for any purpose of the lots on the plat, which were designated by the letters "A" and "R," and died the owner thereof, and they passed by descent to his heirs. It appears that from the year 1815 nothing relating to any of the lands embraced in the patent of January 4, 1786, occurred or was done by any one, either by the heirs of the elder Robert or by any one to whom any part of the lands had attempted to be conveyed, except the transfer of the mortgage to Gibson in 1821, until the year 1858, a period of forty-five years, when Adolph Robert, a son of Louis James Dominique Robert, entered upon a portion of the lands which was embraced by a lot designated on the plat by the letter "A." It does not appear to what extent he intended to possess the lands, as he purchased the holding of some one who was already there, and in 1862 he was killed, and shortly thereafter his family removed from the lands. In the meantime a great many persons claiming by some character of titles, possessory or otherwise, were occupying a portion of the lands within the patent, and in 1872, the heirs of the three sons of the elder Robert, and the heirs of Mrs. Guidee joining with them, brought an action in ejectment in the Federal circuit court for the district of Kentucky, at Louisville, against the occupants of the land, or at least some of them, which resulted in 1876 in a judgment in favor of the plaintiffs for all the lands within the patent, which were claimed by the defendants, except such portions as had been inclosed by such occupants and their predecessors in claim of title, as early as the year 1858. At the institution of this action, nor at any time since, does it appear that the heirs of the sons of the elder Robert had any knowledge of the elder Robert having ever made conveyances to his sons of any portions of the lands, or that the sons had ever conveyed them or mortgaged them, or any portion of them, to any persons whatsoever. After the judgment in the Federal court, various writs of *habere facias* were issued upon the judgment against the claimants of the different portions of the land which in some instances resulted in the occupant being dispossessed, and in others of them becoming tenants of the Robert heirs, but it does not appear that the particular portion of the land claimed by appellants, in this action, was claimed or occupied at the time by any of the persons against whom the judgment was rendered, or for the possession of

which the writs of *habere facias* were issued. An examination of the judgment discloses that the judgment of the court, in favor of the Robert heirs, in the Federal court, was for the possession of such of the lands as were held or claimed by the defendants in that action, and the writs of *habere facias* only authorized the officer to take possession of such lands or to put the plaintiffs in the possession of such lands as were held by the defendants against whom the writs were issued. At the time of the institution of the action in ejectment, the three sons of the elder Robert were dead, and the action was instituted and maintained by the children and grandchildren of the three sons, and the heirs of Mrs. Guidee, as will be hereinafter shown. In 1879 or 1880, the heirs of the three sons of the elder Robert and W. W. Helm and T. W. Bullitt were parties to an action in the Menifee county court, which resulted in a partition of the lands embraced in the patent to the elder Robert, except such portions as the defendants in the action in the Federal court retained under the judgment, and other portions which they were permitted to retain by a compromise. The partition was affected by allotting to the persons composing the different branches of the Robert family certain tracts of the land, respectively, and to Helm and Bullitt, each, a tract in severalty. No heir of Mrs. Guidee appears to have been a party to this action for partition. A deed of partition following a report of commissioners to divide the land and allot to each branch of the family and to Helm and Bullitt a portion of the land in severalty, was executed by a commissioner of the court, for and on behalf of the parties to the action on December 8, 1880. Thereafter, on March 28, 1881, Helm sold and conveyed to Warren Green and L. M. Flournoy an undivided one-half of the lot which had been allotted to him, and conveyed to him by the commissioner, and on January 3, 1882, he sold and conveyed to I. P. Caldwell the other undivided one-half. In the partition, 4,056 acres had been allotted and conveyed to Helm, and the consideration for which he sold the land to Green, Flournoy and Caldwell was $8,000.00. Green, Flournoy and Caldwell sold and conveyed the land which they had obtained from Helm to the Menifee Land and Lumber Company on March 9, 1882, for the sum of $16,224.00. On February 28, 1885, the Menifee Land and Lumber Company made a deed of assignment for the benefit of its creditors to Shackelford Miller. An action in equity to settle the assigned estate was insti-

tuted by Miller, the assignee, in the Menifee circuit court, and resulted in a sale of the land and its joint purchase by S. J. Hobbs and the Louisville City National Bank, and a conveyance to them by a commissioner of the court, on November 17, 1893. Thereafter in an action between the Louisville City National Bank and S. J. Hobbs in the Menifee county court, the lands were partitiond between them and the portion of them upon which appellee is alleged to have committed trespasses, was conveyed to S. J. Hobbs, in severalty, on September 6th, 1897. Hobbs was a trustee for Mrs. Henrietta Morgan, under the will of her father, and had theretofore invested trust funds belonging to his *cestui qui trustent* in the purchase of a note or notes, executed for a part of the purchase price of the land, and thus Hobbs as trustee had a lien upon the land, and in the action to settle the assigned estate above mentioned the lien was asserted, and in satisfaction of the judgment upon the note or notes had become a joint purchaser of the land, and held the title in trust for his *cestui qui trustent*. After the death of the latter, the trust being at an end, Hobbs in settlement of the trust conveyed the land by deed to the devisees of the *cestui que trustent*, who under her will were entitled to receive the trust estate at her death. This conveyance was made on January 4, 1898. On May 6th, 1909, the devisees under the will of Mrs. Morgan and the successors in title of some of them, who had in the meantime died, and who were the grantees in the deed from Hobbs, instituted this action against the appellee, Big Woods Lumber Commpany, alleging that they were the owners and in the actual possession of the land and seeking to recover from the appellee $33,000.00 in damages for trespasses which they aver that it had committed by cutting down, destroying and removing timber trees which were growing upon the land and by making roads upon it, etc. The appellee, which we will hereafter call the defendant, answered denying the ownership or actual possession of the land, or any part of it, by appellants, whom we will hereafter call plaintiffs, and the unlawful cutting, removal or destruction of timber trees or other damage to the land, and affirmatively averring in other paragraphs that such acts as were committed by it upon the lands described in the petition were done and committed by it as an owner and under claim of right to do so. In addition to the foregoing paragraphs containing the traverse the defendant in other separate paragraphs pleaded af-

firmatively that it was the owner of a portion of the land
described in the petition, and other persons than the
plaintiffs owned other portions of it, and that it was upon
such portions that it owned itself or was owned by others
than the plaintiffs upon which it committed any tres-
passes or upon the portions owned by others it had oper-
ated only by the authority of the persons owning them.
The portion which it claimed to own, it alleged it had been
in actual adverse possession of and the persons under
whom it claimed, claiming it to a well defined marked
boundary for such length of time as would create title in
in it, and that the portions from which it had cut timber,
and which belonged to other persons had been in the ad-
verse possession of such other persons and those under
whom they claimed and who claimed it to a well defined
and marked boundary for the period necessary under the
statute of limitations to constitute title. It, also, alleged
that the portion of the lands from which it cut and re-
moved timber and built roads had been in the possession
of itself and predecessors in title, and the persons under
whose authority it acted, and their predecessors in title,
for more than thirty years. It, also, expressly pleaded
and relied upon the five year statute of limitation apply-
ing to injuries to real estate in bar of plaintiffs' cause
of action. In another paragraph it pleaded that the
deed of Hobbs to plaintiffs, as well as all the conveyances,
under which the plaintiffs claim title, were champertous
and void, because the lands from which they had removed
timber trees were held adversely by it or its predecessors
in title or by others and their predecessors in title at the
time the deeds were respectively executed. The defend-
ant, also, alleged that James Turley and Louis Debard
were predecessors in title of the claimants of a portion of
the land upon which the trespasses were committed, and
at the time of the action in the Federal court they were in
possession of all the land which lies under the sandstone
cliffs of East Fork, and that they were made defendants
in the action, and after the issues had been made up and
the evidence heard in the Federal court, the plaintiffs
dismissed their action against Debard and Turley and
their tenant, Powell, and that such constituted a *res judi-
cata* of the question of ownership of that particular por-
tion of the land. Demurrers were offered to the various
paragraphs of the answer, and motions were made to
make the allegations more specific, all of which were
overruled. A good deal of question is made in this rec-

ord, as to the correctness of the rulings of the circuit court upon those demurrers and motions, but we do not find it necessary to further advert to them for the purpose of determining this action upon its merits. Suffice it to say that the pleadings were completed by traversing the allegations of the answer.

On the motion of the defendant, the plaintiffs consenting, the action was transferred to the equity side of the docket, and it was agreed that the court might refer the action on its own motion to a commissioner, other than the master commissioner, to ascertain and report on any question of fact. The case was prepared as in equity, and thereafter the court upon its own motion ordered the case referred to a special commissioner, with directions to ascertain from the pleadings, evidence and exhibits, who was the owner of the lands described in the petition, and (2) the amount of timber trees taken from the land, and the damages suffered to it.

The commissioner was engaged for fifty days in examining the record and making his report, which was to the effect that the plaintiffs did not have any title to the land, but that at the time of the trespasses complained of, a portion of the land was owned by defendant, a portion by Clay, and the remainder was owned by persons whose names the commissioner does not give. It was, also, found and reported that the deeds from Helm to Flournoy, Green and Caldwell were champertous and void. While the report dealt with the value of the timber trees removed from certain portions of the land, it nowhere states the sum total of the value of the timber trees removed from any portion of the land. Exceptions were filed to every finding of either law or fact made in the report, but upon a hearing the exceptions were all overruled, and the court adjudged that the plaintiffs had not shown title to any part of the land, and ordered the petition dismissed. From the judgment the plaintiffs have appealed.

(a) A defect in the title of plaintiffs, it is insisted, arises from the fact that the heirs of Mrs. Guidee were not parties to the partition proceedings in the county court in 1880, in which the tract of land was allotted and conveyed to Helm, and not being parties their interest of an undivided one-fourth never passed from them, and never did vest in Helm. The plaintiffs insist that there is no competent evidence which proves that Mrs. Guidee,

or any heir of hers, survived at the time of the ejectment action in the Federal district court; nor at the time the portion of the land was allotted to Helm. The fact that the elder Robert, in 1796 or 1797, contemplated conveying to his daughter, Mrs. Guidee, the boundaries of land designated upon the plat by the letter "A," and caused such a plat to be made, of course, did not invest her with any title thereto, as the title to lands cannot be transmitted by the mere intention to do so, evidenced by the mere making of a plat. Neither will the fact that the elder Robert thereafter conveyed to his sons certain portions of the lands, at this distance of time, serve to entitle the heirs of Mrs. Guidee to have an equal portion of the land, set apart to her before a division of the remainder among all the heirs of the elder Robert, as it cannot be presumed after a century has passed away, and all knowledge of the disposition of his property has been lost, that he did not in some other manner or by the disposition of other property leave his daughter upon an equality with her brothers, and it must now be presumed that the lots upon the plat designated by the letters "A" and "R" descended to his sons and daughter, an equal moiety to each, in the absence of anything which would indicate to the contrary. It is admitted by all that Mrs. Guidee was a daughter of the elder Robert, and in the absence of any contrary showing it would be presumed that she continued to live to the end of such time as the ordinary span of life, but there is nothing in the evidence to indicate the time of her birth. The record of the ejectment action in the Federal district court has all been lost, except the judgment, the orders of the court made in the prosecution of the action, a deposition of one of the plaintiffs, and the answers of Louis Debard and James Turley, who were defendants in the action, and against whom no judgment was rendered, but as to whom the action was dismissed. Col. T. W. Bullitt, who was an attorney in the prosecution of the action, testifies in this action, that Mrs. Guidee was a daughter of the elder Robert, having acquired his information from reputation in the Robert family, and although the petition in the ejectment action is lost and the caption does not set out the names of the plaintiffs in that action, it is very apparent that the plaintiffs in that action alleged in their petition that Mrs. Guidee was dead, but that she at that time was survived by a son and daughter, who resided in Havre, France, and who were necessarily plaintiffs in the action since

the answers of Debard and Turley, each of whom alleged that he had not information sufficient upon which to form a belief that Mrs. Guidee was one of the four heirs of the elder Robert, or that she had died intestate and left Charles M. Guidee and Frances Denchet, the wife of F. Denchet, as her only children. It is impossible to see why these defendants should have been making such denials, and the further denial that the heirs of Mrs. Guidee then resided in Havre, France, if the plaintiffs had not alleged in the petition that Charles M. Guidee and Frances Denchet were the surviving children of Mrs. Guidee, and were of the plaintiffs, and such facts must have been proven to have justified a judgment in their favor, that they were the heirs of the elder Robert, under whom the plaintiffs in that action were claiming as the basis of their title. The judgment in the ejectment action was rendered on April 6th, 1876, and between that and the institution of this action, the time had not been of sufficient duration to have justified the presumption that either Charles M. Guidee or Frances Denchet had died, and if dead, the latter a married woman had left no children, but upon the other hand the presumption was to the contrary, and in accordance with probability. Only in instances where the evidence shows childlessness or non-marriage will one be presumed to have died without issue. All this record shows is that the heirs of Mrs. Guidee were absent from this country, but never having resided in this country, there is no presumption that after seven years unheard of they would be dead, but instead the presumption would be in accordance with the probability of the duration of life and the leaving of issue at death. 2 Greenleaf, section 354; Faulkner v. Willman, 13 K. L. R. 106; Bank v. Board, etc., 83 Ky. 219; Hayes v. Tribble, 3 B. M. 106. The record of the partition action shows affirmatively, that the heirs of Mrs. Guidee were not parties to it. Being owners of an undivided one-fourth interest in the land, and not being parties to the partition proceedings when a portion was allotted to Helm, any disposition made of the land in such proceeding would be the same as if it had never been had, so far as the interest of the heirs of Mrs. Guidee were affected by it, and likewise as to the effect of the proceeding in which the lands described in the partition were allotted and conveyed to Hobbs. If the plaintiffs were, however, possessed of a title to the interests of the other Robert heirs, they would be owners of an undivided three-fourths of the land de-

scribed in the petition, and would be entitled to recover damages in proportion to their interest, and to the extent of their title. Childers v. Belcher, 142 Ky. 605; Ward v. Harrison, 3 Bibb 304.

(b) It is, further, insisted that the county court of Menifee was without jurisdiction to partition the land, and to allot a portion to Helm, in severalty, for two reasons. The one is that the heirs of Mrs. Guidee were not parties to the action in which the partition was made, and that all the parties having an interest in land must be parties to the proceeding for partition, before the court has jurisdiction to make a partition of it between those seeking a division. Section 499, Civil Code, requires that all persons having an interest shall be either plaintiffs or defendants, and, hence, it is insisted that unless all owning interests are parties to a proceeding for a partition, the partition is invalid, as between even those who are parties and as against strangers. The authorities are in full agreement that a partition is invalid as to any one owning an interest, who is not a party to the partition proceeding, and that is very evident for the reason that the court which makes partition has not jurisdiction of his person, and his interests are not affected any more than, if the joint owners snould partition the land by agreement and execute a deed of partition, and one of the joint owners should not agree to make the partition nor execute the deed. There does not appear to be any sound reason why a partition would not be valid as to those who make application for it as plaintiffs, and those who are summoned as defendants, because by oversight or inadvertence, or want of knowledge, or even design, one of the joint owners is not made a party. Those of the joint owners who procure the partition and those who consent and agree to have their respective interests in the land allotted to them, respectively, in severalty, cannot complain, and certainly no stranger would have any cause of complaint, and while there may be found abundant authority which holds that the proceeding is invalid, as to a party in interest, who was not made a party to the proceeding, no authority has been pointed out which maintains a doctrine to the effect that the proceeding is not valid as to all those participating in it. The principle which provides that a court, if it discovers from the petition or exhibits, that any joint owner is not a party to a partition proceeding, will require him to be made one before proceeding further, and if the record shows that there is a defect of

parties, an appellate court will reverse the judgment, although the attention of the trial court was not called to it, is not overlooked, and the reason for such rule of action is very apparent, but it is not perceived why that would affect the validity of a partition so far as it affected those who were parties to it, and procured it to be done, and so long as the partition is undisturbed. The other reason urged why the judgment for partition is void and the conveyance from the commissioners to Helm, therefore, void, is that Helm was not the holder of a legal title to an interest in the land, and that a court has no power or jurisdiction to make a partition of lands between any, except those holding legal titles. What evidence of title to an interest in the lands that Helm had, and which as must be presumed was before the county court, the record does not disclose. Neither does the record disclose, as insisted, that Helm did not possess any title to any interest whatever in the lands. Upon the other hand, the evidence very satisfactorily shows that Helm had a contract with the plaintiffs in the ejectment suit in the Federal court for a payment to him of a fee in that action. The record does not show indeed the manner in which Helm acquired an interest, but it should not be presumed that he acquired one in an unlawful way. The record does disclose that there were various transactions between Helm and the Robert heirs, and that they executed powers of attorney and conveyances to people who lived upon the lands, and Col. Bullitt testifies that his clients in the ejectment suit owed him a fee in money, and which they discharged by transferring to him in some way a portion of the lands. Section 499, Civil Code, *supra,* does not limit the persons between whom a court may make a partition of lands to holders of legal titles. The term used therein to describe the person who may compel a partition is one holding land jointly with others. This term includes a co-parcener, tenant in common, and a joint tenant and the holders of both legal and equitable titles. A holder of an equitable title to an interest in land, if he has a present right of possession in contradistinction to an interest to be enjoyed in the future as a remainder or a reversion, may assert his right and have a partition. Hillens v. Brinsfield, 108 Ala. 605; Stein v. McGrath, 128 Ala. 175; Luco v. Toro, 91 Cal. 405; Fitch v. Miller, 200 Ill. 170; Call v. Barker, 12 Me. 320; Hanna v. Clark, 189 Pa. State 321; 30 Cyc. 195. Subsection 7 of section 499, Civil Code, provides that where a partition

of land between the joint owners is made, and the report of partition confirmed, the court shall by commissioner cause the land allotted to each of them to be conveyed to him by a deed, and thus vesting him with a legal title, whether his ownership of an undivided portion before the partition was evidenced by a legal or equitable title. This section would have the effect of changing the common law rule that a cotenant receives only the same character of title held by him before the partition, to the portion allotted to him, when the joint owner is one who has only an equitable title to his interest, and thus when the partition is consummated his equitable title is converted into a legal one. Subsection 11 of section 499, *supra,* which provides that when an issue is made in the county court, the action shall be removed on motion of either party to the circuit court for trial, does not affect the view above expressed when no issue is made in the county court, and the case is not removed to the circuit court and no complaint ever made upon that subject. Further, when this action was instituted it had been nearly thirty years since the partition, during which time none of the heirs of Robert had ever complained of it, nor was any complaint of it made during the pendency of this action in the circuit court, the termination of which from the period of the partition had been nearly forty years. Helm took possession of the allotment to him, and he and his vendees exercised control over it for years thereafter. The heirs of Robert, with the exception of the heirs of Mrs. Guidee, were estopped to deny the title of Helm which they had caused to be made to him, or which they had made to him. The county court by the section of the Code, *supra,* is made a court of general jurisdiction for the partition of lands among joint owners. Being such its judgments and decrees in partition are immune from collateral attack upon jurisdictional grounds as other judgments and decrees of courts of general jurisdiction. Its judgments are, also, supported by the same presumptions as support the judgments of any other court of general jurisdiction. The statute gives it jurisdiction of the subject matter, and when it has jurisdiction, also, of the persons of those interested in land to be partitioned, and a partition is made, it will be presumed to have been regularly done, and that the parties between whom the partition was made were such as were entitled to such relief. It should be here noted that the record does not

affirmatively show that Helm was not a joint owner of the lands partitioned. All presumptions in favor of the validity of the judgment of the county court in partition proceedings must be indulged when absolutely not inconsistent with the record. Mere irregularities in the exercise of its jurisdiction, or an error in its conclusions or a showing that some question was decided otherwise than it should have been, will not affect the integrity of the judgment. 30 Cyc. 306, 288. We are aware that some of the older opinions of this court do not accord to the judgments of the county court in partition proceedings the immunity from collateral attack which is accorded to them here, but our conclusion is fully supported by the terms of the statute and by the more recent decisions of the court. It must therefore be conclusively presumed in the absence of anything in the record to the contrary, that there was on file with the record of the partition proceedings, such evidence of title upon the part of Helm, as justified the court in alloting to him a portion of the land in the partition. All that can be said with regard to the partition proceedings is that the record here does not show the presence of the jurisdictional fact of the ownership by Helm of an interest in the land, before the county court, but before the integrity of the judgment can be successfully assailed collaterally, it must affirmatively appear that such evidence was not before the court especially at this distance of time, and in favor of a stranger to that title, and a mere negative showing is not sufficient. Seigle v. Reisert, 128 Ky. 117; Miller v. Farmers Bank, 25 K. L. R. 373; Alves v. Dennis, 132 Ky. 345.

(c) The evidence supporting the contention of plaintiffs that the Robert patent is located as contended for by them, is not as satisfactory and conclusive as might be, which in great part arises from the ravages of time, the destruction of landmarks and death of those who participated in its original location, or had first hand information of it, but a recitation of the evidence pro and con, it is apparent, can not be here made, but suffice it to say, we are of the opinion that the lands described in the petition are clearly within the boundary covered by the P. D. Robert patent of January 4, 1786.

There can be no question, and none is made of the chain of paper title from Helm to the plaintiffs, except the claim that such conveyances were champertous. Hence the record title shown from P. D. Robert, the original

patentee, to plaintiffs, shows title in them to the lands embraced in the deed from the trustee of Mrs. Morgan, unless their title suffers defeat for some reason independent of anything, which is inherent in the title itself.

(d)   As a ground upon which it is urged that the plaintiffs have not title to the lands, or a part of them, described in the petition, it is pointed out that the lands embraced within the lots designated on the plat, heretofore referred to by the letters A, B, C, and D, were included in the partition of the lands, between the heirs of the elder Robert and Helm and Bullitt, and that the elder Robert did not die the owner of the lots, but had in his lifetime conveyed the lots designated by the letters B, C and D, as heretofore set out, to his three sons, and had indicated his purpose to convey the lots marked A, on the plat to Mrs. Guidee, and that the sons had disposed of the lots conveyed to them, respectively, as heretofore stated.   The elder Robert never attempted to part with the title to the lands embraced in the lots designated by the letter A.   The lands described in the petition, do not include any of the lands embraced in the lots, which were conveyed by the elder Robert to his three sons, or conveyed by them to Brown, Dumesnil or Mentelle, except a portion of the lots No. 30 and 31, which were conveyed by the elder Robert to his son, Henry John James, and by him to Waldemar Mentelle.   Neither Mentelle nor any of his heirs except those who are heirs, also, of Henry John James Robert, have ever asserted ownership or control over the lots, although more than a century has elapsed since the conveyance to Mentelle.   The heirs of Henry John James Robert are, also, heirs of Mentelle, and such of the heirs of Mentelle parted with any claim they may have had as the heirs of Mentelle by participation in the partition and the allotment to Helm.   Several other heirs of Mentelle executed a deed of release for their apparent interest in the lots, stating as the consideration for their action, the fact that the deed to Mentelle, in 1814, was executed by Henry John James Robert to secure a debt which he owed to Mentelle, and which had long since been satisfied.   There is no conclusive showing that Mentelle has any heirs, except those who executed the deed of release, and those who are, also, heirs of Henry John James Robert, and who joined in the partition with Helm, and the preceding transaction which resulted in his being entitled to participation, although it would be presumed

from the evidence that doubtless there are other heirs of Mentelle than those mentioned. However, if Mentelle has any other heirs, the deed from him to Henry John James Robert can not prevail against the claims of the plaintiffs, which are derived from Helm through Flournoy, Green and Caldwell, and the Menifee Land and Lumber Company, and the trustee of Mrs. Morgan, and all of whom were purchasers for a valuable consideration, and without notice of the deed to Mentelle. When the deed to Mentelle was executed in 1814, the statute required that when one executed a deed conveying lands which were not situated in the county where he resided, he could execute and acknowledge the deed in the county where he resided, and it should then be recorded in that county within four months, and upon a certification of the acknowledgment and record, it must then be recorded in the county wherein the lands were situated, within eight months. This recordation, or at least lodgment for record, was necessary to give constructive notice of the deed to a purchaser for value, and without actual notice, and against the claim of such a purchaser, a deed not recorded as required by law, could not be read as evidence. As heretofore shown, the deed from the elder Robert to his son, Henry John James, nor the deed from the latter to Mentelle was ever recorded or lodged for record in the county of the location of the land. The above doctrine has been in full force from that time until this, and while until 1858 it was held that only innocent purchasers under deeds made by an ancestor, would prevail against another claiming under a prior unrecorded deed, or deed not recorded in the proper county, in that year, the provisions of the statute were extended to embrace innocent purchasers under deeds made by heirs and as against prior unrecorded deeds made by the ancestors. Acts of 1785, 1792, 1796 and 1831, 1 B. M., pages 432, 437, 450, Kentucky Statutes, 494; Taylor v. McDonald, 2 Bibb 421; Gilpin v. Davis, 2 Bibb 416; Morgan v. Beal, 1 Mar. 310; Winlock v. Hardy, 4 Litt. 272; Graham v. Samuel, 1 Dana 167; Dozier v. Barnett, 13 Bush 457.

(e) It is insisted as a defense to the right of recovery that certain deeds in the chain of plaintiffs' title are champertous, and therefore void. The deed from the commissioner, etc., to Helm, it is contended, is void, because the contract between him and the Robert heirs whom he represented as an attorney in the ejectment ac-

tion in the Federal court, was that he, as an attorney, should prosecute that action for the recovery of the lands from those then adversely holding them, and should receive for his services a portion of the land recovered, in violation of section 211, Kentucky Statutes, which declares a contract to prosecute a suit for the recovery of lands in the adverse possession of another, for a whole or a part of the land possessed, to be null and void, and that the claim sued upon is to be forfeited to the Commonwealth and inure to the benefit of the person in possession without office found. It is, however, to be observed that no such forfeiture was made effective in the Federal court, and that the plaintiffs recovered a judgment therein for the possession of the lands. Without determining what effect the contract between Robert's heirs and Helm, if champertous under section 211, Kentucky Statutes, would have upon the title of subsequent innocent purchasers, suffice it to say that the burden of proving the contract to be vicious is upon the defendant, and the presumption is that the contract was lawful rather than unlawful. The contract is not here, and the vague expressions of the understanding of one of the witnesses, who never saw the contract, as to what the contract was, is not sufficient to overthrow the presumption of its validity in its absence, or that of any evidence which purports to supply its terms after such a distance of time, and the death of those who participated in making the contract. Col. Bullitt who represented some of the heirs in the same action deposes that his contract was for a payment of a fee in money, and that it was paid by a sale to him of an interest in the land after the recovery of the judgment, which would not be a champertous contract. Evans v. Bell, 6 Dana 479; Wilhite v. Roberts, 4 Dana 172; Ramsey v. Trent, 10 B. M. 36; Mills v. Hall, 147 Ky. 598; Wood-Heck v. Roll, 183 Ky. 128. Bullitt does not depose as to the terms of Helm's contract with his clients, but it is only reasonable to conclude under all the circumstances that Helm's contract was of the same character, and was satisfied in the same way, as the right and interests of their respective clients were of the same character and were adjusted in the same way as Helm and Bullitt seem to have acted in concert.

(f) The other deeds in plaintiffs' chain of title are alleged to be champertous, because in violation of section 212, Kentucky Statutes, which provides that the sale of

any land then held in adverse possession of another should be void, but the contention will be considered in connection with the defendant's defenses of title to the land in it and in others by adverse possession as such possession would be necessary at the time of the execution of the deeds to make them champertous under that statute.

(g) The plaintiffs' alleged title to the lands embraced in the deed to them, and the defendants having denied their title to any of the land embraced within their deed, the title to it all was put in issue, and the court, as heretofore stated, adjudged that the plaintiffs were not the owners of any part of the land. Independent of alleged defects in the title of plaintiffs, the defendant claims that it and others have acquired title by adverse possession to the portions of the lands upon which it committed the alleged trespasses, and that such trespasses as it committed upon portions of the lands not owned by it, it committed by the authority of the owners. The evidence proves that the different portions of the lands are distinguished by names by which the portions are called, one of which is the upper Peters tract, the lower Peters tract, little East Fork, the Magowan lands, the Brooks tract and the Hunter land. The three first named tracts are claimed by French and Apperson from whom, or their predecessors in title, the defendant purchased the timber trees upon the three tracts. The defendant claims to be, itself, the owner of the Magowan lands. It is claimed that J. W. Clay is the owner of the Brooks tract, and that the timber trees taken from that tract, the defendant purchased from Clay, who caused the trees to be cut and delivered to it at a point outside of the lands of plaintiffs, and that it paid for them so much per foot in the log, and manufactured the logs into lumber and sold it to its customers. To be intelligible a small, rude map of the lands embraced within plaintiffs' deed, and showing the distinctive portions of it, is inserted. It is not pretended, that this drawing is correct but is the best representation that the evidence and maps on file convey to the mind, and will illustrate our meaning. A, B, C and D designate the P. D. Robert patent. J, K, I, F, G, H and E the land allotted to Helm. E, F, G and H the lands of plaintiffs.

(1)    The defendant does not pretend, itself, to own
or that any one else owns the Hunter tract of land.   No
trespasses were proven to have been committed upon it
by the defendant, yet it put plaintiffs' title to it in issue,
and the court held that the plaintiffs had failed to show
title to it.   From the foregoing it will be observed that in
this finding the court was in error.

(2)   The evidence as to adverse possession by French and Apperson, and those under whom they claim to the upper Peters, lower Peters and little East Fork tracts is voluminous and contradictory, and a recitation of it herein would be neither profitable nor possible. We have carefully examined it all, and are of the opinion that the defendant has shown that French and Apperson, and the persons under whom they claim title, have been in the adverse, continuous, peaceable and exclusive possession of the upper and lower Peters tracts for at least forty years before the institution of this action, claiming those tracts to a well defined boundary, of such notoriety as to give notice of their hostile holding, and the plaintiffs should not recover on account of any trespasses committed upon them as their paper title is defeated by the title created by the adverse holding of French and Apperson, and the persons under whom they claim. We are, however, of the opinion that French and Apperson, and the persons under whom they claim title, have not been in such an adverse, continuous, peaceable and exclusive possession, claiming adversely to well defined boundaries of the little East Fork tract for such a length of time as would create title in them, prior to the filing of this action, and for that reason the plaintiffs are entitled to recover for such trespasses as the defendant committed upon that tract.

(3)   The defendant has not shown such a continuous, exclusive and peaceable possession of the Magowan lands which are embraced within the deed of the plaintiffs, for such a length of time preceding the bringing of this action, as would create title in it by adverse possession, and while nearly all the damages committed by the defendant to that tract were committed more than five years before the bringing of this action, the plaintiffs are entitled to recover for whatever damages were committed within five years before the bringing of this action, and it was error in the court to adjudge that the plaintiffs had not shown title to the land.

(4)   No sufficient showing was made of any title in J. W. Clay to the Brooks tract, by adverse possession, and the one question in the case with relation to that tract is whether the defendant can be made responsible for the trespasses committed upon that tract by J. W. Clay, through his agent, M. C. Clay, within five years before the bringing of this action. We are of the opinion that the defendant is responsible to the plaintiffs for such damages. For as we gather from the evidence the defendant

contracted with Clay to cut and deliver to it the timber trees growing upon that tract, and that the injury to the tract resulted directly from the acts called for and rendered necessary by the contract, and not from any acts which were merely collateral to it. It appears that it contracted with Clay to cut and deliver the timber trees upon that tract to it. 16 A. & E. Encyc. 196; 14 R. C. L. 89; Matheny v. Wolf, 2 Duv. 137.

In arriving at the above conclusions we have considered the facts as to each tract, separately, and endeavored to apply to it the rules and principles of the law which relate to the creation of title by adverse possession, as the defendant, nor any one under whom it claims, has any claim of title, except that which arises from adversary possession and under deeds, which purport titles, not traceable to the Commonwealth, nor to any one having title in any other way. We have not overlooked the doctrine that when an actual entry is made under a senior grant with the intention of the grantee to claim possession to the extent of the boundaries of his title, he thereby becomes in actual possession of all the land described by the instrument which makes his title, except such portions of it as may be at that time in the actual possession of another; nor have we failed to apply the doctrine that where there is a claimant under a senior grant who has never entered into possession, and one holding under a junior grant, the boundaries of all of which is within the senior grant, and before the entry of the senior grantee the junior grantee has taken actual possession of his grant, under a deed describing its boundaries, he is presumed to be in the actual possession to the extent of his boundaries, and that possession is not broken, until the senior grantee also enters upon the junior grant, and, at least, the junior grantee so holds to the extent of his inclosures. A further principle which we have not overlooked is that a claimant under a junior grant which laps upon a senior grant is not in actual possession of any part of his grant which is covered by the senior grant, unless he actually enters upon the lap. In determining what constitutes actual possession and constructive possession, we have considered that natural barriers supplemented by artificial barriers in the way of fences which together clearly indicate the purpose of the occupants to exercise dominion over the premises, and to give the necessary notice that possession is claimed, will be sufficient to start an adversary

holding which will set the statute of limitations in operation if the natural barriers are not out of proportion to the artificial barriers. Dowdle v. Wheeler, 76 Ark. 529; Clithero v. Fenner, 122 Wis. 356; Ann. Cas. 1913A and note. The principles mentioned, which relate to the doctrine of adverse possession are so well known that the citation of authority is unnecessary.

There is no sufficient evidence of adverse possession of any of the tracts, except the two Peters tracts, to make the deeds to Flournoy, Green and Caldwell, or by them to the Menifee Land and Lumber Company, champertous, and the deed by Hobbs to the persons, who were in fact his *cestui que trustents,* is not a transaction capable of being champertous. The other deeds were made by direction of judgments of courts, which as a rule are not champertous.

Therefore, the judgment so far as it relates to the upper Peters tract and to the lower Peters tract of land is affirmed, but the judgment so far as it relates to the Hunter tract, the Magowan land, the little East Fork and the Brooks tract is reversed, with directions to the court to ascertain the damages to the four last mentioned tracts, within five years before the filing of this action, and to adjudge that the plaintiffs recover three-fourths of such damages against the defendant.