# Turk et al. v. Wilson's Heirs.

(Decided May 22, 1936.)

WHEELER, WHEELER & SHELBOURNE and HOLIFIELD, GARDNER & McDONALD for appellants.

LUCIEN R. SMITH for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming in part and reversing in part.

Our appellants are the children and heirs of J. W. Turk, and they are appealing from a judgment which deprives them of what they asserted was a perfectly good title inherited from their father to about 450 acres of land on Island No. 3 in the Mississippi river in Carlisle County, Ky. And the appellees are the heirs of T. J. Wilson; they are not only seeking to hold the 450 acres recovered in this judgment, but by cross-appeal are seeking to get about 110 acres more than was awarded to them by this judgment, and all of which they claim by inheritance from their father.

## Suit Filed.

T. J. Wilson began this action on October 22, 1925, by filing in the Carlisle circuit court a petition in equity

against the six children and heirs at law of J. W. Turk, who had died intestate on February 11, 1916.

While this litigation was pending, T. J. Wilson, on December 7, 1932, died intestate, domiciled in Carlisle county, Ky., survived by two sons and three daughters, namely, Pat Wilson, Arleigh Wilson, Annie Wilson Sams, Ora Wilson Gorham, and Hattie Wilson Bishop as his only children and heirs at law. All of these children were married. Pat Wilson and Arleigh Wilson were appointed and qualified as administrators of T. J. Wilson, and on March 1, 1933, this action was revived in the names of the said administrators as such and in the names of all five of said children and their respective spouses as plaintiffs.

In the judgment which was entered on November 10, 1933, there is no mention of the administrators of T. J. Wilson, and the only ones to whom relief was awarded or denied are the five children of T. J. Wilson and the six children of J. W. Turk.

### Island No. 3.

The islands in the Mississippi river below Cairo going downstream were numbered. Of these, Islands 1, 2, 3, 5, and 8 belong to Kentucky. See section 198, Ky. Stats. Island No. 10 made no small contribution to the history of this nation in the War Between the States in the sixties. Island No. 5, sometimes called "Wolf Island," made some contribution to our national jurisprudence in the case of Missouri v. Kentucky, 11 Wall. (78 U. S.) 395, 20 L. Ed. 116, but it remained for Island No. 3 in our state jurisprudence to make quite a contribution as will appear from this case and from those listed below, and for our convenience we have identified these opinions by letters and shall so refer to them in this opinion, and we shall refer to appellants as "Turk's heirs" and to appellees as "Wilson's heirs."

### Former Opinions.

(a) 1907, Hilleary v. Wilson, 100 S. W. 1190, 30 Ky. Law Rep. 1262.

(b) 1910, Wilson v. Watson, 141 Ky. 324, 132 S. W. 563, 35 L. R. A. (N. S.) 227.

(c) 1911, Wilson v. Watson (rehearing), 144 Ky. 352, 138 S. W. 283, Ann. Cas. 1913 A, 774.

(d) 1912, Carson v. Turk, 146 Ky. 733, 143 S. W. 393, 42 L. R. A. (N. S.) 384.

(e) 1912, Watson v. Wilson, 150 Ky. 27, 149 S. W. 1120.

(f))1915, Caughlin v. Wilson, 167 Ky. 35, 180 S. W. 40.

(g) 1918, Taylor v. Wilson, 182 Ky. 592, 206 S. W. 865.

(h) 1920, Wilson v. Caughlin, 187 Ky. 221, 218 S. W. 1010.

The student will better understand this opinion by first reading the above opinions.

### Genesis.

On the 31st of January, 1898, T. J. Wilson bought of S. Mathias and wife 102 acres of land, which was part of a tract of 237½ acres patented to Price and H. L. Edrington on September 19, 1837 (patent I. C. 4). In the same deed, T. J. Wilson acquired title to 140 acres which had been patented on June 15, 1872, to William Parson (patent C. C. O. 47615).

On November 26, 1899, T. J. Wilson acquired from Noah J. Parsons title to 70 acres which on June 15, 1872, had been patented to William Parsons (patent C. C. O. 47614). In this same deed T. J. Wilson acquired 10 acres which had been included in the above patent C. C. O. 47614 to William Parsons.

All four of these properties are described in opinion (a), supra, and Wilson's heirs in this case have established by the evidence their derivation of title from the commonwealth under these patents, mesne conveyances, etc.

These river islands are not very stable. The river cuts and carries some of them away and adds to others. For example, Island No. 10, for the possession of which so much blood and treasure were expended in the sixties, has entirely disappeared, while Island No. 3 has by accretion been enlarged to far beyond its former proportions. This accretion has not been uniform all around the island, but has occurred on the western side, and on the eastern side the island is being slowly eroded by the action of the river.

This accretion was in progress when Wilson bought the four tracts above mentioned, and this may have been an inducement to him to make his purchases. Wilson asserted his ownership of these accretions, while

others regarded them as vacant land and proceeded to survey them and take out patents upon them, so that in a few years there were a number of rival claimants asserting title to these accretions under the following junior patents and possibly others.

| No. | Date | Acreage | Patentee |
|---|---|---|---|
| L.W.T. 9300 | Dec. 31, 1897 | 66½ | James Johnson |
| L.W.T. 9301 | Dec. 31, 1897 | 100 | Mrs. F. E. Johnson |
| L.W.T. 9302 | Jan. 26, 1898 | 73 | J. B. Shook |
| C.C.O. 66320 | Feb. 20, 1900 | 200 | W. H. Ponder |
| C.C.O. 66321 | Feb. 20, 1900 | 200 | W. J. White |
| L.W.T. 9303 | Apr. 5, 1900 | 99 | C. W. Dupree |
| L.W.T. 9304 | Apr. 5, 1900 | 195 | J. W. Turk |
| L.W.T. 9305 | Apr. 5, 1900 | 200 | J. S. Atkins |
| L.W.T. 9306 | Apr. 5, 1900 | 200 | James Johnson |
| L.W.T. 9307 | Apr. 5, 1900 | 100 | Eli Allen |
| L.W.T. 9308 | Apr. 5, 1900 | 100 | J. S. Atkins |
| L.W.T. 9309 | June 20, 1900 | 100 | Mrs. F. E. Johnson |
| L.W.T. 9310 | Dec. 1, 1900 | 200 | C. D. Bridgman |
| C.C.O. 66364 | May 3, 1901 | 200 | C. D. Bridgman |
| C.C.O. 66365 | May 3, 1901 | 200 | C. D. Bridgman |
| C.C.O. 67189 | Apr. 27, 1904 | 200 | Elma Atkins |

## War Begins.

Now began a sort of thirty years' war over these accretions, which has resulted in the various opinions cited in the earlier part of this opinion. In this war Wilson was right and has been uniformly successful except as to patent L. W. T. 9300 66½ acres which he lost to Caughlin under opinion (h) by allowing him to remain in possession too long.

This record is the account of one more campaign in that war and involves the title to accretions formed to the west of Wilson's property and lying south of the "Atwood line."

## The Atwood Line.

On the first trial of the case of Wilson v. Watson (see opinions [b] and [c]), there had been offered for Wilson an instruction, which was refused by the court, which instruction if given would have required the jury to find for Wilson as to all land not in the adverse possession of Watson, which the evidence showed lay south of a line so run westward from Wilson's northwest corner (six cottonwoods) across these accretions as to intersect or cross the thread of the stream of the Mis-

sissippi river at a right angle. In opinion (c) this court held Wilson was entitled to such an instruction, and after the mandate issued in that case and in preparation for a second trial of it, a surveyor named T. L. Atwood ran that line from the six cottonwoods corner so as to cross the thread of the stream of the Mississippi river at a right angle, and Mr. Atwood's testimony is in this record. He testifies this line was run as stated above and that its course is N. 68 W., true meridian. His testimony is the only evidence in this record relative to the course a line from this six cottonwoods corner would have to run so as to cross the thread of the stream of the Mississippi river at a right angle. This line is known as the "Atwood line."

Wilson is asserting ownership to all of these accretions south of the Atwood line, except of course the 66½ acres that he lost under opinion (h). This claim of his takes in 38 acres of patent C. C. O. 66320, all but about 2 acres of patent C. C. O. 66321, all of patents L. W. T. 9304 and L. W. T. 9302, and 56 acres of patent L. W. T. 9308.

All of these patents issued for these accretions are absolutely void, and it was so held regarding those involved in the above cited opinions. By the statute then in effect, these patents are void (see section 3 of chapter 136, Acts 1891-92-93), and by taking them out each of the would-be patentees committed a misdemeanor (see section 5, idem).

During the progress of this litigation, Turk's heirs perhaps realized the futility of relying on these patents as a basis for their claims, and they asserted title to these properties under an alleged adverse possession of them which we shall discuss as soon as we shall have briefly described the lands affected.

### Topography of This Land.

These accretions do not consist of towering hills or undulating mesas, but of low, flat lands, much cut up by sloughs, chutes, swamps, lakes, ponds, etc. We recall now Sand Cut, Deep Cut, No. 2 Chute, No. 3 Chute, Albert Chute, Wauhee Chute, Black Slough, Brady's Lake, etc. There is none of this property more than a few feet above the water at ordinary stage of the river. All of it overflows, and some witnesses say as much as 15 feet. When the water is 37 feet on the gauge at Cairo, the sloughs are full, and at 50 feet it is all over

the whole island, and the water at Cairo sometimes gets to 57 feet on the gauge.

Though this is the nature of this land now, yet a few years ago the territory, where these lands now appear, in ordinary stages of the river, was covered by many feet of water and steamboats plied the river above it. When the above-mentioned patents to Price and H. L. Edrington and to William Parsons were issued, the commonwealth parted with its title and those patents vested title in those patentees, not only to the land embraced within the lines thereof, but also title to the adjacent river bed out to the middle thread of the stream upon which they abutted. Wilson's actual possession of the lands described in his deeds from Mathias and Parsons is conceded, and the law carries that actual possession out to the middle thread of the river.

So long as this territory remained submerged, a right existed in the public to use it for the purpose of navigation; still the title conferred by these patents vested the ownership of the river bed out to the middle thread of the stream in those patentees and in Wilson when, by the above-recited conveyances from Mathias and Parsons, he acquired this property.

Even while this territory was still submerged his ownership of it existed and he could have recovered for the removal of material therefrom. The Bedford-Nugent Co. v. Herndon, 196 Ky. 477, 244 S. W. 908. If by accretions the river bed be so raised as to push the channel of the river out farther from the shore, such change of channel carried Wilson's title and actual possession out with it and also conferred title and actual possession in him to new accretions as they formed. Id.

In this view of the nature of these accretions and Wilson's title thereto, it is at once apparent the parties, who attempted to acquire patents to these accretions as these parties did by these junior patents, had no more right to do so than they would have had to patent the ground in Paducah whereon stands the Citizens' Savings Bank Building, the ground in Louisville whereon the Kentucky Home Life Building stands, the site of the McClure Building in Frankfort, the site of the Second National Bank Building in Ashland, or the site of the new post office in Lexington. The commonwealth having previously parted with its title could confer none by these junior patents.

## Adverse Possession.

Turk's heirs are contending that they have acquired title to these properties by adverse possession, and there is much evidence about what they now have cleared and in cultivation. They cannot recover upon the basis of their present cultivations, but must go back to October 22, 1910, fifteen years previous to the filing of this action, must show what they then had in possession and cultivation. If they had clear and convincing evidence they had cleared and put in cultivation 500 acres in November, 1910, fenced it, and cultivated it since without interruption, that would avail them nothing. October 22, 1910, is the dead line, and the question is: What was the status then? What had John W. Turk then south of this Atwood line, inclosed and reduced to possession?

Turk took one of these junior patents (L. W. T. 9304 for 195 acres) on April 5, 1900. He bought another (C. C. O. 66320 for 200 acres) from W. H. Ponder on November 11, 1903; another (C. C. O. 66321 for 200 acres) from W. J. White on November 11, 1903; another (L. W. T. 9308 for 100 acres) from J. S. Atkins on November 14, 1903; and another (L. W. T. 9302 for 73 acres) from J. B. Shook on September 28, 1904.

Of these, about two acres of the White tract, 162 acres of the Ponder tract, and 44 acres of the Atkins tract lie north of the Atwood line. With these 208 acres north of the Atwood line and all possession or ownership of them we are not concerned. They are not involved. The only land or possession involved here is the 560 acres south of the Atwood line. Wilson's heirs claim the land south of this Atwood line, they assert and manifest their ownership of it under senior patents, and they must prevail unless Turk's heirs are able to show some adverse possession of some part of it had and maintained by their father on October 22, 1910, and by him, their mother, and them since continued in full vigor. They are in privity with him, they inherited this land from him, and to their mother's and to their possession can be tacked the possession their father had from October 22, 1910, to his death on February 11, 1916, and that of their mother to whom this was assigned as dower from this last date to September 9, 1920, when she surrendered her dower by conveyance to them. If they can show any possession so maintained without in-

terruption all that time, then to that extent they should prevail.

### Efforts of Turk's Heirs to Show Possession.

Their first effort was to show the lines of the five junior patents, to which they assert title, are plainly marked and can easily be found. This is conceded.

Their next effort was to show an entry upon and some clearing and cultivation of these junior patents. With those portions of those junior patents and all improvements thereof north of the Atwood line we are not concerned. Possession and improvements there are not available to them south of this line. Now all of the land embraced within Turk's junior patent L. W. T. 9304, junior patent L. W. T. 9302, and portions of the three other junior patents here involved, cover land owned and possessed by Wilson's heirs under senior patents. Such land so covered by two patents has been given various names. Here are some of them, "lap," "overlap," "lappage," "interference," "conflict," and "interlock." All these words mean the same thing. They are all used to designate the land that is common to both the conflicting grants. Until some reason is suggested for not doing so, we shall use the word "interlock," since it is used in many of our opinions, is used in Corpus Juris (see 2 C. J. p. 245, sec. 537), and will perhaps be most readily understood.

Turk's heirs erroneously assert that by their clearings, fencing, and improvements they have acquired an actual possession which the law will by construction carry out to the outer confines of all these junior patents, and that being thus in actual adverse possession of a part they will be regarded as constructively in adverse possession of the whole of them.

This court through Judge Carroll answered adversely that contention in Elliott v. Hensley, 188 Ky. 444, 222 S. W. 507, 509, in which opinion he said:

"The mere fact that the same person happened to obtain the four patents at the same time did not have the effect of converting the land covered by them into one body, in the sense that an adverse claimant, by making an actual entry within one of the patents, might assert claim to the others or any part of them. It would be extending far beyond reasonable or just bounds the doctrine of adverse

possession to permit an intruder to perfect his claim of adverse possession to several adjoining, uninclosed, vacant tracts of land, each conveyed to the rightful owner by separate title, on the ground that he had taken actual physical possession of one of the tracts. * * * Notwithstanding the plain declarations in the cases cited that a person who has good title to a tract of land on which he actually resides cannot assert title by adverse possession to an adjoining tract that he claims under a color of title deed or patent, without having made an actual entry and taking actual possession thereof, attorneys are continually, but unavailingly, attempting to ignore the principle so firmly established.''

Each tract must be regarded as a separate and distinct parcel, and if any title is sought to be acquired to land in any portion of any of these junior patents, it must be accomplished by an adverse possession shown to have been upon such separate tract maintained, not elsewhere. In Flinn v. Blakeman, 254 Ky. 416, 71 S. W. (2d) 961, 973, we said:

''If a would be disseizor desires to do any disseizing, he must get upon and hold possession of the coveted property, he must do his disseizing there, he cannot do it elsewhere. Disseizure cannot be accomplished by any form of absent treatment.''
Thus we see that Turk's heirs, if they did maintain an adverse possession upon one of these junior patents, would acquire thereby no rights upon another.

The next erroneous claim made by Turk's heirs is that by the adverse possession they claim to have had upon junior patent L. W. T. 9308 (the 100 acres bought of Atkins), they acquired title to the whole of it because, as they erroneously assert, the law will carry their adverse possession by construction out to the confines of the description contained in that junior patent.

Their clearing and improvement on this Atkins junior patent is largely confined to the northern part of the patent, but just for the purpose of answering this question we are for the moment conceding for the sake of argument that some portion of their improvement came south of the Atwood line, and the question is what rights did Turk's heirs thereby obtain. Remember Wilson's heirs have title and possession south of the Atwood line under senior patents and that all of the At-

kins 100-acre patent (L. W. T. 9308) that extends south of the Atwood line interlocks with senior patents held and occupied by Wilson, and if we concede Turk's heirs have an adverse possession there, then the question is: What is the effect of it? The answer is that Turk's heirs would only gain thereby their close and no more.

Wilson's heirs under their senior patents had already entered years before but not within the interlock, but the law by construction carried their actual possession to their outside boundaries, and when Turk's heirs made their tortious entry within the interlock, Wilson's constructive possession held the possession of Turk's heirs to their close. There cannot be two constructive possessions of the same property at the same time. Wilson has a constructive possession based upon senior title and actual occupation outside the interlock. Turk's heirs claim under a void patent and an adverse occupation within the interlock. The law awards the constructive possession to Wilson because he has the better title. The Turks must be held to their close. For Kentucky rule, see 2 C. J. p. 246 sec. 538; also, see Ball v. Lively, 1 Dana (31 Ky.) 60; Shrieve v. Summers, 1 Dana (31 Ky.) 239; Moss v. Currie, 1 Dana (31 Ky.) 266; Harrison v. McDaniel, 2 Dana (32 Ky.) 348; Simon v. Gouge, 12 B. Mon. (51 Ky.) 156; Surratt v. Donaldson, 3 Ky. Opin. 576; Caudill v. Caudill, 52 S. W. 957, 21 Ky. Law Rep. 713; Cuyler v. Bush, 84 S. W. 579, 27 Ky. Law Rep. 148; Woodward v. Johnson, 122 Ky. 160, 90 S. W. 1076, 28 Ky. Law Rep. 1091; Miniard v. Napier, 167 Ky. 208, 180 S. W. 363; Ky. Union Co. v. Lovely, 179 Ky. 459, 200 S. W. 950; Foster v. Roberts, 179 Ky. 752, 201 S. W. 334; Morgan v. Big Woods Lumber Co., 198 Ky. 88, 249 S. W. 329; Maynard v. Lowe, 231 Ky. 258, 21 S. W. (2d) 285.

What we have said regarding the possession on the Atkins tract applies to the possession on the Shook tract. The trial court refused to make any order regarding 5 acres of the Atkins tract and 26 acres of the Shook tract. This was done because the court considered this an action to quiet title and felt Wilson's heirs failed to show possession of the 5 acres and the 26 acres. Those were the only possessions the Turk heirs had any evidence to establish. The trial court located the Atwood line as running from the six cottonwoods corner N. 75 W. to the Mississippi and gave Wilson's heirs a judgment for all the land south of that line, except the 5 acres and the

26 acres.   At this point we want to consider some other phases of this record developed by the evidence. The tract covered by junior patent L. W. T. 9302, known in this record as the Shook land or Shook patent, is shown to lie west of the junior patent L. W. T. 9300 lost by Wilson under opinion (h), and Turk's heirs repeatedly asked about its location, evidently believing that by so showing they were destroying Wilson's paramount title to the accretions west of that 66½ acres (junior patent L. W. T. 9300); but that belief on the part of Turk's heirs is not well founded, and resulted from their failure to give proper consideration to the nature of a man's ownership of accretions.   Wilson's title to these accretions does not date from the time they appeared above the water, he owned the river bed on which the accretions were deposited, and Wilson's right goes back to the patents under which he holds title.

When adverse possession was taken of the 66½ acres (junior patent L. W. T. 9300), that adverse possessor got just what he inclosed, no more, and Wilson's title and possession to the accretions and river bed west of this 66½ acres was no more affected by that adverse possession than was the title to Wilson's land north, south or east of it, nor any more than Wilson's title would have been affected to land owned by Wilson in Pike county, Ky., if he had owned land there.   That adverse possessor perfected his title to that 66½ acres, and that was all.   Wilson's title all around that 66½ acres continued and was just the same after that judgment as it was before; hence Turk's heirs are not benefitted by showing the Shook land lay directly west of the 66½ acres.   That was settled under opinions (f) and (d) and (h), supra.   Moreover, Caughlin, the successful adverse possessor under opinion (h), has since sold to John C. Ford the land he recovered under that opinion, by definite metes and bounds, so that Ford acquired a definite piece of property fixed, known, confined, and delimited by the description in the deed Caughlin made him.   In 2 C. J. p. 240 sec. 519, it is said that this is analogous to the case of a man who saws off between himself and the trunk of the tree a limb on which he is sitting.   Besides that there is in this record an agreement signed by T. J. Wilson and John C. Ford fixing the boundaries of this 66½ acres.   Both of these men testified and both testify to such an agreement; hence the trial court correctly held Wilson's title to accretions

other than the 66½ acres was not affected by the loss of title to the 66½ acres.

## Abandonment.

Another question that was asked witness after witness was whether or not Wilson asserted any claim to this Turk land. This causes us to wonder what Turk's heirs thought Wilson was doing by this suit. This is just about as solemn an assertion and claim of ownership as Wilson could make. Of course, Wilson testified he claimed it all the time, and one of the witnesses introduced by Turk's heirs testified Wilson claimed it, but the most of the witnesses for Turk's heirs testified Wilson did not claim it. We suppose this testimony was put in for the purpose of establishing some sort of an abandonment of this land by Wilson. Remember Wilson had perfect paper title to this land going back to the commonwealth, and he was in possession of it.

By virtue of the provisions of section 470, Ky. Stats. (the statute of frauds), there is but one way for a man to part with a vested title to real estate, and that is by a writing signed by him. A vested fee-simple title to real estate cannot be abandoned. If a man should go away and leave it for forty, fifty, or any other number of years, and no one should seize and occupy the property adversely, or it should not be sold for taxes, the returning owner would perhaps find his property grown up with saplings and bushes, but he would find his title unimpaired. See Carroll County Academy v. Trustees of Gallatin Academy, 104 Ky. 621, 47 S. W. 617, 20 Ky. Law Rep. 824; Cox v. Colossal Cavern Co., 210 Ky. 612, 276 S. W. 540; Gray-Mellon Oil Co. v. Fairchild, 219 Ky. 143, 292 S. W. 743; Tarver v. Deppen, 132 Ga. 798, 65 S. E. 177, 24 L. R. A. (N. S.) 1161; Barrett v. Kansas, etc., Coal Co., 70 Kan. 649, 79 P. 150; East Tenn. Iron, etc., Co. v. Wiggin (C. C. A.) 68 F. 446; 1 C. J. p. 10, sec. 14; 1 Am. Jur., Abandonment, sec. 6. The trial court properly treated this evidence as not affecting Wilson's title.

## A Kindred Question.

After Mr. Turk's death in 1916, his widow and heirs were for some time engaged in the partition of his property and the allotment of her dower, and after Mr. Turk's widow, in 1920, relinquished her dower in this land to the children born to her and Mr. Turk, these children were for some time engaged in surveying and

partitioning this property among themselves, and Turk's heirs have in this record evidence that this surveying, etc., took some months on each occasion, that it was openly done, was well known in the community, and Mr. Wilson must have known it, but he said nothing. Mr. Wilson testifies he knew nothing of any of this surveying or partitioning. Turk's heirs have no evidence that he did; they simply argue that it was so openly done he must have known. This is somewhat like evidence of abandonment and amounts to nothing. Suppose Wilson had been along when this was done. He did not have to speak; these people were not buying from each other; they were simply dividing what they already had, or, rather, what they thought they had.

Another question put to witness after witness was this: "Who was in possession of these properties after John W. Turk bought them?" Witness after witness responded, "John W. Turk." Such questions and answers amount to nothing.

An element of possession, which is necessary to cause it to ripen into a title, is that it must be visible and notorious. The true owner must have knowledge of the hostile claim, or the possession must be so visible and notorious as to raise the presumption of notice to every one that the right of the owner is invaded intentionally, with a purpose to assert a title adverse to his.

"And: 'For one to simply make claim by his thoughts to a body of land, which has no other boundary than natural water courses, natural stones, bluffs, cliffs, gaps in cliffs, and mountains, * * * would not give notice to the owner nor any one else of the claimant's intentions.' "

That was quoted with approval in Cox v. Colossal Cavern Co., 210 Ky. 612, 276 S. W. 540, 544. Other cases to same effect are cited in the Cox Case. To same effect, see Flinn v. Blakeman, 254 Ky. 416, 71 S. W. (2d) 961.

"Again, in Nelson v. Johnson, 189 Ky. 815, 226 S. W. 94, this court held that the bare actual possession alone of a tract of land is no evidence of an adverse holding, since one in possession is always presumed to be holding in subservience to the legal title."

To acquire title by adverse possession requires more than simply bare possession. We pointed out in Piney Oil & Gas Co. v. Scott, 258 Ky. 51, 79 S. W. (2d) 394, it

requires an adverse occupation and use. Bare possession does not constitute adverse possession. There must be some use of the property so openly, notoriously, and visibly made as to afford notice to the owner. 2 C. J. 50 sec. 1; Flinn v. Blakeman, 254 Ky. 416, 71 S. W. (2d) 961.

Another oft-repeated question related to the taxes on this property and who paid them. That has nothing to do with this case. That was settled early in the history of this state. See Smith v. Morrow, 7 T. B. Mon. (23 Ky.) 234, 240. Other cases to same effect are: Overton v. Overton, 123 Ky. 311, 96 S. W. 469, 29 Ky. Law Rep. 736; Kash v. Lewis, 224 Ky. 679, 6 S. W. (2d) 1098; Griffith Lumber Co. v. Kirk, 228 Ky. 310, 14 S. W. (2d) 1075; Kypadel Coal & Lumber Co. v. Millard, 165 Ky. 432, 177 S. W. 270.

Whether a recovery could be had of Wilson's heirs under section 4033, Ky. Stats., for the sums so paid, is a question not now before us.

### The Question in Issue.

Besides the evidence in other litigation that it was stipulated should be considered, there are five volumes of new evidence in this case. Many witnesses were examined and thousands of questions were asked, but there were but two questions directly on the issue, and here they are: "I am not talking about how it is now, but how it was in 1920 and 1910. It was fenced then. How much of it, I don't know."

It is unfortunate that there is so little evidence on that crucial point. The appellants cannot succeed by virtue of any possessions, clearings, improvements, etc., begun or extended subsequent to October 22, 1910. "To obtain a title to land by adverse possession, the person in possession must hold to a well-defined boundary, and he cannot move his boundary out year by year, and claim at the end of the statutory period all the land then within the boundary." Carson v. Turk, 146 Ky. 733, 143 S. W. 393, 394, 42 L. R. A. (N. S.) 384. Their father was a party to that case, and Turk's heirs ought to have known that and to have directed their evidence to the status existing October 22, 1910.

### Are These Lands Accretions?

Appellants contend the evidence does not show these lands are accretions to the Wilson land, but we cannot

agree with them; the evidence is overwhelmingly against them. Adjoining lands were held to be accretions to the Wilson land in opinions (a), (c), (e), (f), (g), and (h), supra, and the lands involved here must also be held to be accretions to the Wilson land, for the reasons given in those opinions.

### The Federal Question.

Turk's heirs assert our ruling in opinion (a), supra, is in conflict with the Federal Constitution, clause 3, sec. 8, art. 1, which provides:

"The Congress shall have Power * * * to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

In support of this contention they cite section 403 of 33 U. S. C. A., and say:

"The powers asserted in the foregoing section by the Federal Congress could not exist unless the Federal government owned the bed of the navigable streams."

To us it appears this question was settled adversely to them by the Supreme Court of the United States in Missouri v. Kentucky, 11 Wall. 395, 401, 20 L. Ed. 116, from which opinion we quote the following:

"The treaty between France, Spain, and England, in February, 1763, stipulated that the middle of the River Mississippi should be the boundary between the British and the French territories on the continent of North America. And this line, established by the only sovereign powers at the time interested in the subject, has remained ever since as they settled it. It was recognized by the treaty of peace with Great Britain of 1783, and by different treaties since then, the last of which resulted in the acquisition of the territory of Louisiana [embracing the country west of the Mississippi] by the United States in 1803. The boundaries of Missouri, when she was admitted into the Union as a State in 1820, were fixed on this basis, as were those of Arkansas in 1836. And Kentucky succeeded, in 1792, to the ancient right and possession of Virginia, which extended, by virtue of these treaties, to the middle of the bed of the Mississippi River."

The United States Supreme Court, in the case of Gibson v. United States, 166 U. S. 269, 272, 17 S. Ct.

578, 41 L. Ed. 996, has held that although the navigable waters of the United States are under its control for the purpose of regulating and improving navigation, the title to the shore and submerged soil is in the various states and the individual owners under them.

The state of Kentucky in the leading case of Berry v. Snyder, 3 Bush, 266, 284, 285, 96 Am. Dec. 219, holds that the rights of riparian owners (under grant from the state) in the beds of navigable rivers do not conflict with the use of the water of such rivers for purposes of navigation.

We find nothing in opinion (a), supra, or in this opinion in conflict with our Federal Constitution.

Does Wilson's Title Include These Accretions?

We regard this question as settled in the opinions (a), (c), (e), (g), and (h), supra, and see no need for further discussion of it, but will content ourselves by adding these opinions and cases cited in them. City of Covington v. State Tax Comm., 231 Ky. 606, 21 S. W. (2d) 1010; Ironton & Russell Bridge Co. v. City of Russell, 262 Ky. 778, 91 S. W. (2d) 1; Williamsburg Boom Co. v. Smith, 84 Ky. 372, 1 S. W. 765, 8 Ky. Law Rep. 369; Strange v. Spalding, 29 S. W. 137, 17 Ky. Law Rep. 305; City of Uniontown v. Berry, 73 S. W. 774, 24 Ky. Law Rep. 2248; Robinson v. Wells, 142 Ky. 800, 135 S. W. 317.

Turk's heirs assert all of these opinions are erroneous and that we have misconstrued and misunderstood the common law, which we inherited from Virginia, and they cite the case of James River & Kanawha Power Co. v. Old Dominion Iron & Steel Corp., 138 Va. 461, 122 S. E. 344, in which it was held that the bed of James river at Richmond was a part of the public domain of that state; hence they argue Kentucky had no power by its patents to confer on Wilson title to any part of the bed of the Mississippi.

A careful reading of that opinion will show that by an act approved March 1, 1819, certain unappropriated lands on Chesapeake Bay, on the seashore, and the beds of rivers and creeks were withdrawn from entry; hence the land office of Virginia had no power to make the grants to Smith and to Neilson under which the appellant power company was claiming title. This act of 1819 was an extension of an act of May, 1780, which had de-

nied to the land office power to make such grants in the eastern part of the state only. We are unable to find anywhere any limitation that would prevent this state from making to Price and H. L. Edrington the grants under which Wilson's heirs are claiming. That in the absence of such limitation the state would have this power appears to be settled by the opinion in Smith v. Maryland, 18 How. 71, 74, 15 L. Ed. 269, where the court used this language:

> "Whatever soil below low-water mark is the subject of exclusive propriety and ownership, belongs to the State on whose maritime border, and within whose territory it lies, subject to any lawful grants of that soil by the State, or the sovereign power which governed its territory before the declaration of independence."

We are persuaded the law of Virginia as regards the bed of a river is not different from the law of this state, by this which is taken from Hayes' Ex'r v. Bowman, 1 Rand. 417:

> "Where the commonwealth, having title to lands lying on both sides of a water-course not navigable, grants the lands lying on one side thereof, and bounded thereby, it is universally admitted, that such grant carries with it, the title to a moiety of the bed of the water-course."

### The Grants to Price and H. L. Edrington.

Turk's heirs attack the patents under which Wilson holds title and cite the following acts in support of their attack:

Act of December 22, 1818, p. 1040, M. & B. Statutes.
Act of February 14, 1820, p. 1040, M. & B. Statutes.
Act of December 21, 1821, p. 1048, M. & B. Statutes.
Act of January 8, 1829, p. 1060, M. & B. Statutes.
Act of January 22, 1830, p. 1063, M. & B. Statutes.

We find, however, this patent was issued pursuant to "An act authorizing the sale of islands in the Mississippi, and of Cash Island in the Ohio River," which is chapter 295 of Acts of 1836 and 1837 and was approved February 15, 1837. See page 193 of those acts.

This act limited the amount of land that could be acquired under it to 300 acres, and Turk's heirs contend

that is all that can be claimed thereunder. The patent to Price and H. L. Edrington called for 237½ acres, which seems to have been the extent of Island No. 3 at that time. Therefore, say Turk's heirs, why should Wilson's heirs have any more?

This brings up the question of the ownership of accretions over which jurists have puzzled and scratched their heads since the litigation between the old Romans, Attius and Titius, noted by Pothier in his Pandects of Justinian. A few of the reasons assigned are: "De dinimis non curat lex." "Acquisition of title by accretion compensates for loss by erosion." 2 Black Comm. 262. "It is compensation for preventing erosion." "Otherwise there would be numberless unoccupied littoral gores." Gifford v. Yarborough, 5 Bing. 163.

"Natural justice requires that such accretion should belong to the upland owner, so that he will not be shut off from the water, and thus converted into an inland rather than a littoral owner." Steers v. City of Brooklyn, 101 N. Y. 51, 4 N. E. 7, 8.

Frontage on, and immediate access to, a stream of water, especially a stream like the Mississippi, adds materially to the value of property having such frontage, and where, through no fault of the owner of such adjoining lands, the operation of natural forces makes deposits in front of the owner's property which cause the shore line to recede, if such deposits be not adjudged to such adjoining owner, he may soon find his property far inland with an intervening strip, and possibly a hostile proprietor, between it and the water. To thus change a littoral into an inland owner would be inequitable. Other reasons may be found in Yearsley v. Gipple, 104 Neb. 88, 175 N. W. 641, 8 A. L. R. 636, the notes following it, and in 67 C. J. p. 821, sec. 221 et seq.

### The Ross Patent.

This question is also raised by Turk's heirs, but we regard it as settled by opinion (e), supra.

We have now carefully considered every question raised by Turk's heirs; we find all of them without merit; hence this judgment must be affirmed on the original appeal; and we come now to the questions raised on the cross-appeal.

### The Location of the Atwood Line.

The trial court erred when he failed to locate this

line as running N. 68 W. (true meridian) from the six cottonwoods corner. How accretions shall be divided is definitely settled in this state by the opinion in Miller v. Hepburn, 8 Bush (71 Ky.) 326, to be "by extending the original river frontage of the respective lots as nearly as practicable at right angles with the course of the river to the thread of the stream."

That rule is the one usually adopted. See 67 C. J. p. 827, sec. 235. The only evidence in this record touching the proper course this line should take to meet the requirements of the above rule favors its location as N. 68 W.

### The Five Acres and the Twenty-Six Acres.

When Wilson began this action, he described the land he sought to recover; Turk's heirs in their answer described meticulously 768 acres which they asserted belonged to them. Of this 768 acres, 208 acres lie north of the Atwood line. With that we are not concerned, but with the 560 acres lying south of that line we are concerned.

Turk's heirs have by the evidence in this record shown that upon October 22, 1910, there was a tract of about 5 acres of junior patent 9308 (the Atkins 100 acres), lying just south of this Atwood line, which Turk on October 22, 1910, had in his actual possession, cleared, fenced, and was cultivating; that he continued such possession until he died on February 11, 1916; his widow thereafter continued it until she relinquished it to her children by her deed of September 9, 1920, and they have continued such possession since then. These possessions can be tacked together, and when so tacked it matures and perfects title to this 5 acres in whichever one or ones of Turk's heirs it may be to whom by their partition this 5 acres has been allotted.

In like manner the title to 26 acres of junior patent 9302 (the Shook 73 acres) has been perfected. Surveys should have been made, and these two tracts should have been described and such evidence introduced that we could now direct to whom and for what judgment should be entered concerning them; but the failure of this record to contain a description of these two tracts does not conflict with subsection 2 of section 125 of the Civil Code of Practice as construed in Foster v. Roberts, 179 Ky. 752, 201 S. W. 334, for they are parts of larger tracts

that were properly described, and as that is certain which can be made certain, the refusal of the court to make any order concerning these two tracts was error, and upon the return of this case the court will by proper proceedings obtain a proper and sufficient description of this 5 acres of cleared land located as stated and of 26 acres of cleared land on junior patent 9302, so laid off as to include the house, and will adjudge the ownership thereof to such of Turk's heirs as may manifest their right thereto.

### Requiring Wilson to Elect.

Wilson joined with his action for the recovery of this land an action for trespass and asserted a claim on the latter account for $3,000. This cause should have been transferred to the common-law docket and both of these causes of action heard by a jury, but as no such motion was made that was waived. There was a time when an action for the recovery of land could not be joined with an action for trespass, but that was changed on March 13, 1888, by the adoption of chapter 490, acts of that year, now section 2163, Ky. Stats. The court required Wilson to elect which cause of action he would prosecute, and Wilson elected to pursue his action to recover his land.

No further order was entered relative to the trespass, but the effect of what was done was to compel Wilson to dismiss involuntarily the action of trespass without prejudice, which was erroneous and upon the return of the case the trial court will hear and determine that issue. See Jones' Assignee v. Johnson, 10 Bush (73 Ky.) 649, in which opinion this was said:

> "It is insisted, however, that as the plaintiffs chose to elect and to strike out one cause of action, instead of standing by and allowing their petition to be dismissed, they have waived the error. We do not think so. They had a right to avoid as far as they could the effect of the rule and to bide their time for the correction of the error, and, having come to this court with an appeal from a final judgment in the case, to ask that all the rulings of the court prejudicial to them shall be reviewed."

Judgment affirmed on the original appeal, and reversed on the cross-appeal for proceedings and judgment as indicated.