# Whitson et al. v. Morris et al.

November 8, 1946.

Rehearing denied May 13, 1947.

M. C. Anderson, Special Judge.

J. E. Warren and C. K. Davis for appellants.

W. J. Webb and E. E. Lebo for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

This is an action and counteraction to quiet title to 1,155 acres of alluvial land which was reformed or created by reappearance after the original soil had been washed away or submerged by the Mississippi River.

We agree with the appellants that the history and geography of the locality is of interest. We quote from their brief:

"Of all the inconceivably, mischievous pranks upon its neighbors by this 'Ole Man River' in his ubiquitous and incomprehensible process of 'just keep rolling along' in its course to the Gulf of Mexico, the most peculiar is that perpetrated on or against the States of Kentucky and Missouri just above the point where these two states join Tennessee, and which is the location in controversy. Within an area of not exceeding fifty square miles north and east of this juncture, it forms a complete inverted letter 'S,' thereby creating a peninsula in Missouri some two or three miles in width and jutting south some seven miles in length into Kentucky and Tennessee, and another peninsula in Kentucky of about equal length and slightly greater width extending north from the State of Tennessee and bounded on three sides (east, north and west) by Missouri. This latter peninsula is known as Madrid Bend, or sometimes as Kentucky Bend, and is a portion of Fulton County, Kentucky. In order to reach it by direct route from the remainder of the county, it is necessary to cross the river twice and traverse this intervening part of Missouri. The indirect route, however, and the one which is used in travel, is to go out of Kentucky, proceed some five miles or more into Tennessee, around the first river bend and thence back up to Kentucky—a circuitous route of ten or twelve miles in order to reach a point not more than two and a half miles from the starting point on the line between Kentucky and Tennessee."

The locus in quo is the southwest corner of Madrid Bend. Before 1900 the river at this point was relatively straight, flowing almost due south. Erosion began on the east bank. It was greatly accelerated in 1912, and by 1914 the river had cut back a great semicircle two or two and one half miles deep. Some estimated that the river was five miles wide at this place. It almost

cut the peninsula in two. Three entire sections and parts of three others of rich land were submerged. Some persons lost all of their land in the area. Others had parts of their tracts left. Others, whose land had been two miles or more from the stream, became riparian owners. A bar had begun to form in the old bed closer to the Missouri shore than to the new Kentucky shore. By 1914 it had become a considerable island. In that year J. R. Adams and J. F. Adams, who had lost much land in the catastrophe, obtained patents from the Commonwealth for 200 acres each on the island as unclaimed or vacant land. Section 4704, Ky. Stats., now KRS 56.230. The two tracts formed an exact rectangle, leaving marginal land all around the edges, the island being elliptical or oval in shape. There were navigable channels on both sides. The new channel formed by the wash-out was the principal one, being 50 feet deep. By 1918 the west channel became only a chute and not navigable. Afterward there was some dredging and this channel began to widen and cut into the island. Eventually the capricious river deserted the new channel and returned substantially to its original bed. Most, if not all, of the island disappeared and the great curve which had washed out from the main land filled up to within ten feet· of its original level. That alluvial deposit is the land involved in this litigation. There are many witnesses and much detail, but this is the heart of the case.

Dan Whitson and Charles Keaton were successors in title of the Adamses to the 400 acres on the island. They claim the re-formed land as accretions to it. To clear their title they instituted this action against a number of persons who owned the land which had been washed away. In response the defendants set up their claims and sought to have their respective titles quieted. Four groups filed separate answers and counterclaims, but no cross-actions against one another. They set up chains of title devolved from patents or grants by the Commonwealth issued in 1825 and one in 1833. Both sides pleaded adverse possession. The defendants charged that the Adamses' grants were champertous; also that no part of the land involved was embraced within them. The judgment dismissed the petition and quieted the title of the defendants.

The property of one of the defendants, now appellees, Mrs. Lucille Cunningham, extended into Tennessee. It was all washed away except a small corner on the southeast. One Prevow, the owner of land back of her property that had in part become riparian, claimed all of the new or re-formed land out to the restored river channel. In a well-reasoned and fully supported opinion the Western Section of the Court of Appeals of Tennessee held that the original lines of land on a navigable stream which disappear by the process of erosion cease to exist and thereafter the relationship of the then riparian lands and the river determines the ownership of subsequent accretions, so that the land thus formed belongs to the owner of the remoter tract, even though the accretions constitute the entire area occupied by the original riparian tract. It was accordingly held that Prevow had title to the recreated land intervening between his original property and the river, and that Mrs. Cunningham was entitled only to that part between the small corner which she had left and the present river channel. Cunningham v. Prevow, Tenn. App., 192 S. W. 2d 338. Certiorari was denied by the Supreme Court of Tennessee. The northern part of the same tract, all of which was washed away, is involved in this suit.

Since the claim of the plaintiffs is to accretions to land on the other side of the deserted channel, i. e., the island, and the opposition of the defendants, both defensive and offensive, is "all for one and one for all," the same particular problem is not presented in this case. The issue to be decided is whether the appellants established their title as against the appellees as a group, the division among them being of no present concern to either the appellants or the courts. This would be so even without the united opposition, for it is a familiar rule that in an action to quiet title the plaintiff stands or falls upon his own claim.

It is the established rule, recognized by the parties, that if a watercourse is a described line of a tract of land, or a line runs to the bank of a stream, the stream is considered as a single line and the owner's title extends by construction of law over the bed in front of his land to the middle of the stream; and if the shore line gradually shifts the boundary is still the middle of the stream from the lowwater mark wherever it may be.

If his land increases, he is not accountable to any one for the gain; if it is diminished, he has no recourse for the loss. Ordinarily the owner of the mainland whose boundary is thus extended owns the intervening islands newly made or arising in the area of the extension of his lateral lines at right angles with the course of the stream, and if he holds under a grant, a junior patent to the island is nugatory. However, where a permanent island of long existence, having a separate and well-defined body of land has been patented apart from the mainland, so that the subsequent grantee of the mainland does not acquire the island unless he can produce title back to a senior patent, his title to the bed of the stream will be regarded as extending only to the center line between the island and the shore, and the right to accretions belongs to the island to the same extent as to the mainland. Cruikshanks v. Wilmer, 93 Ky. 19, 20, 18 S. W. 1018, 1019, 13 Ky. Law Rep. 888; Spurrier v. Hodges, 90 S. W. 559, 28 Ky. Law Rep. 804; Hilleary v. Wilson, 100 S. W. 1190, 30 Ky. Law Rep. 1262; Wilson v. Watson, 144 Ky. 352, 138 S. W. 283, Ann. Cas. 1913A, 724; Nugent v. Mallory, 145 Ky. 824, 141 S. W. 850; Caughlin v. Wilson, 167 Ky. 35, 180 S. W. 40; McGill v. Thrasher, 221 Ky. 789, 299 S. W. 955; Turk v. Wilson's Heirs, 266 Ky. 78, 98 S. W. 2d 4. There is no evidence of the location of the land of the appellees with relation to the river when patents were issued for it by the Commonwealth in 1825 or 1833. It appears that in 1880 the shore was a considerable distance west of the line established by the appellees. It may have been farther away fifty-five years before or may have been within the lines. We cannot tell. It seems to us not necessary to consider the claims of invalidity of the Adams patents because they covered land already patented to the appellees' predecessors in title; nor the claim of champerty with respect to later conveyances. We proceed upon the hypothesis of validity of the original title to the 400 acres of appellants' predecessors, the Adamses.

Regardless of the appellants' contention that the patents and mesne conveyances of the appellees' land (save a deed to Harris heirs) do not call for the river as a boundary (the descriptions being by section, quarter-section, etc.) so that they should be considered as not

having been riparian, it seems quite certain as a matter of fact that the various owners had possessory title to the water's edge, and their property was contiguous to the stream, either at the time of greatest encroachment or at an intervening time before the accretions began or the deserted channel caused by the reliction had filled up. On the other side: it is the rule in this jurisdiction that accretions to an island, substantial in area in normal stages of the water, will be regarded the same as are accretions to mainland. Caughlin v. Wilson, supra; McGill v. Thrasher, supra.

The evidence concerning the progress of the recession of the waters and the forming of this alluvial land is conflicting and confusing. There is frequent reference to the formation of the "Watson bar," but its location is indefinite. There are two large maps made by. the United States Government, and several small, partial sketches, but no comprehensive plat. Perhaps the sketch filed with the deposition of Mrs. Kirby was such, but it has been left out of the record. It is said in some of the briefs that this bar was north of the extended boundaries of the defendants and of the island also. A number of witnesses testified this land formed from or on that bar southwardly; others that it began and was added to the island; others that it began at the east bank of the new channel (defendants' land) and grew westwardly. We are not concerned with the origin of the alluvial soil but where it settled. Those witnesses who related that the accretions were to the mainland gave as their reason, or to support their opinion, the fact that the present growth on that side is much the larger, the willows and cottonwood trees being three to four inches in diameter. Witnesses introduced by the plaintiffs said the new-made ground was higher on the island side. A large aerial photograph made in 1937 reveals two sloughs, somewhat diagonal of the area, and "the doctrine of accretion will not admit of jumping a slough." Nugent v. Mallory, supra (145 Ky. 824, 141 S. W. 854). But there is little or no testimony as to that situation or condition in 1942 when this litigation began. It seems that this area, i. e., the re-formed land, is normally useful only for grazing. The willows and cottonwood may also have some value.

We must confess that the decision is a difficult one

to make, for there is much reason to believe that the deposits of alluvium were quite evenly spread over the area between the island and the mainland. It is said in appellants' brief that the special chancellor found as a fact that it was an accretion to the island but decided the case for the defendants on the finding that the island was located within the boundaries of the original grants of the mainland to defendants' predecessors, and that upon its reappearance after submergence the successors of the original grantees or patentees became re-vested eo instanti and ipso facto with title to the island and its accretions. As we have said, the evidence as to the relation of the island to the mainland before the major erosion of the east bank is not clear. But the rule of reappearance after submergence does not seem applicable where the submergence was in fact (as apparently here) a complete disappearance for an extensive period.

There is great doubt whether the plaintiffs' predecessors in title and they themselves were ever really owners of riparian lands to which the accretions were contiguous. The grants were not to the island but to land on an island with metes and bounds or marked corners. The sketches or plats of the surveys of the patented land show each of the 200 acre tracts as a perfect square and land all around the edges. The appellants contend that the lines are nothing more than scrolls of the draftsman. But there is a large U. S. Government detail map, drawn to a scale, of the island and surrounding lands, as well as the river soundings, in 1915. It shows the island to have been elliptical or oval, as we have said, and when a plat of the 400 acres of the Adamses' patents drawn on the same scale is superimposed, it corroborates verbal testimony that there was perhaps as much as 700 to 1,000 feet in places not covered by the grants, so that the patented area was not contiguous to the water. More than that, it would seem that the island disappeared in the process of the cutting through the west chute and the return of the river to its original channel. We are left in doubt whether this had occurred by the time the accretions grew up above the surface of the water at normal stage. If that was the case, then it is clear the plaintiffs could have no claim whatsoever. Coupled with this is the better evidence that the adhesions were to the mainland, or that the formation grew from it, and the

law that the plaintiffs must have established their own title and may not rely on any weakness in the defendants' title. Therefore, on the whole record we have reached the conclusion that the judgment should be, and it is, affirmed.