## Massachusetts Bonding & Insurance Company v. Dale.

(Decided May 20, 1932.)

KING & BARKER and FOSTER V. COX for appellant.

I. B. ROSS and SAMUEL HOLMES for appellee.

OPINION OF THE COURT BY HOBSON, COMMISSIONER—Reversing.

Appellee, who was the beneficiary in a life and accident policy issued by appellant insuring the life of Walter Barnett Dale in the sum of $1,000, brought this action against appellant to recover on the policy, and judgment having been entered for the plaintiff, the defendant appeals.

The plaintiff, in her petition, set out the insuring clause of the policy, which was in these words:

"This policy insures against: (1) the effects resulting directly and exclusively of all other causes, from bodily injury sutained during the life of the policy solely through external, violent and accidental means (excluding suicide, sane or insane), said

bodily injury so sustained being hereinafter referred to as 'such injury.' . . . Principal Sum One Thousand and no/100 Dollars.''

She then alleged that on or about March 14, 1929, while the policy was in full force, Dale sustained personal bodily injury which was effected directly and independently of all other causes through external, violent, and purely accidental means and resulted in his loss of life on that day; that the injury was by a gunshot wound, and that the gunshot wound was accidental, external, and violent; and that death resulted from it and was due solely to external, violent, and accidental means.

The defendant demurred to the petition; the demurrer was overruled; and it then filed answer in which it alleged that the policy, among its exceptions in a subsequent clause, contained this provision:

''Sec. (c) This policy does not cover death, disability or loss of the Insured caused by or resulting directly or indirectly from . . . injuries intentionally inflicted upon the Insured by any person other than himself (assaults by burglars or robbers excepted).''

It then alleged that it was true that Dale was killed by a gunshot wound and came to his death therefrom immediately, but denied that the gunshot wound was accidental, and alleged that Dale was shot and killed by Samuel Neal with a pistol with the intention to kill him, and that the shooting of Dale, resulting in his death, was intentionally inflicted upon him by Neal and for the purpose of destroying his life; that Dale was intoxicated and that the difficulty was brought on by reason of intoxicants; and that the death of Dale was not the result of or caused by a burglar or a robber, and that the death of Dale was not insured against in the policy but expressly excepted therefrom.

By consent of parties the affirmative allegations of the answer were controverted of record. The case came on for trial, and on the statement of the case by counsel to the jury, the court ruled that the burden of proof was on the defendant; to this ruling it excepted.

Thereupon the proof was heard which, stated briefly, showed these facts: Both Dale and Neal were negroes living in the outskirts of Carlisle, Ky. Dale was twenty-

seven years old; was a teacher in the school, and also sold newspapers. He was going around with his papers, and about 5:30 p. m., in making change with Mary Groves, as she testified, had in his hand a roll of paper money. She did not know what it amounted to, but it was quite a roll. About 6 o'clock Dale and Neal were seen talking and Neal asked him to come down to his house and Dale agreed to go. A short time after this Dale went to the house of his aunt, Laura Dale, and borrowed a basket. Neal and his wife had no children. His wife was away from home. They occupied two rooms, a kitchen and a room in front of it. A little after 7 o'clock a shot was heard there. Neal came to the door and called to his wife, "Oh, Emmie come here, don't you know I am liable to have to go myself." Soon after this bottles were heard rattling there. Several persons came in in a few minutes, and Neal told them that the lamp exploded and killed Dale. To one person he said that a beer bottle busted and the top struck him on the head. When asked if there was any pistol there, he said that there was no pistol there and none had been there. Dale's body was lying on the floor, straightened out like it had been laid out, with his hands on his chest, holding a letter in one hand and his hat on his abdomen. There were no signs of an explosion in the room. The lighted lamp was on the table. There were some pieces of glass on the floor, but none under the body of Dale. Every thing in the room was in good order. There was no money in Dale's pocket, except a few pennies, but on the floor not far from his pocket was a 25-cent piece. The next morning there was found a pistol under the mattress in Neal's front room. One of the loads had been shot and the others all were in the pistol. It had been recently fired, as shown by the powder marks. On the autopsy of Dale's body they found a ball in the back of his head corresponding with the balls of this pistol. The ball had entered in his mouth and lodged in the back of his head. He died practically instantly. The next morning, under the edge of a neighbor's house, the basket which Dale had borrowed the night before was found empty, and near the basket and also under the edge of the house were found a lot of bottles, a copper funnel, and a jar. The proof showed that Neal and Dale had been friendly and when last seen Dale was perfectly sober. He was a sober man by habit. His right wrist was bruised and swollen, but there was no other injury upon his person,

except the pistol shot. The windows and doors of the room were all closed and in good condition. There was no indication that the shot was fired through them or that there had been any disturbance in the room.

Among others the court gave the jury these instructions:

"No. 1. The court instructs the jury that if they believe from the evidence the decedent, Walter Dale, came to his death from gunshots wounds intentionally inflicted by another, and not in an assault committed by such other person, if any, for the purpose of robbery, then the law is for the defendant company and you should so find.

"No. 2. If the jury believe from the evidence that the said Walter Dale came to his death in an assault committed upon him for the purpose of robbery you will find for the plaintiff the sum of $1,000, with six per cent interest from September 13, 1929, the amount claimed in the petition."

The jury returned the following verdict:

"We, the jury, find that Walter Dale was killed by Sam Neal for the purpose of robbery. We base our verdict on Instruction No. 2.

Jesse J. Wilson, Foreman."

Appellant relies on these grounds for reversal: (1) The court erred in overruling the demurrer to the petition. (2) The court erred in holding that the burden of proof was on the defendant. (3) The court erred in refusing to instruct the jury peremptorily to find for the defendant. (4) The verdict is palpably against the evidence. (5) The court erred in refusing a new trial for newly discovered evidence.

1. It is insisted that the petition was insufficient, because it failed to allege that the insured did not die from suicide. Under section 119 of the Civil Code of Practice facts which are presumed to exist from the facts stated need not be alleged in a pleading. In Philadelphia Life Ins. Co. v. Farnsley's Admr., 162 Ky. 27, 171 S. W. 1004, 1005, after distinguishing some other cases, the court citing many authorities thus stated the rule in a case like this:

"However, it is the generally accepted rule that death by suicide need not be negatived by the

pleader. And this is true, we take it, whether the nonliability on account thereof appears in a proviso or an exception, or whether it occurs in the principal clause or in a separate and distinct clause. The reason for the rule is plain. Self-destruction is contrary to the general conduct of mankind. Men love and cling to life with such intensity that the presumption of suicide is utterly abhorrent to the law and cannot be indulged in.'' To the same effect see Security Life Ins. Co. v. Duncan, 184 Ky. 443, 211 S. W. 758.

The demurrer to the petition was therefore properly overruled.

2. Was the burden of proof properly placed upon the defendant? In Aetna Life Ins. Co. v. Rustin, 151 Ky. 103, 151 S. W. 366, 368, the court after stating the reasons for the rule thus laid it down.

"Under this rule, it was unnecessary for the plaintiff to allege facts showing that the limiting clause did not apply, and, it not being necessary for her to allege these facts, it was not necessary that she should in the first place prove them. The burden was on the defendant both to allege and prove them, and it was a question for the jury on all the evidence in what manner the deceased came to his death.''

To the same effect, see Louisville & N. R. Co. v. Woodford, 153 Ky. 185, 154 S. W. 1083; Sovereign Camp v. Valentine, 173 Ky. 185, 190 S. W. 712. The rule was also recognized in Bingham v. Continental Casualty Co., 219 Ky. 501, 293 S. W. 968, 970, in these words:

"Where a policy contains a general clause containing a promise to pay and also a separate and distinct clause which has the effect of taking out of the general clause something which would otherwise be included in it, a party relying on the general clause may, in pleading, set out that clause only, and it then devolves on the insurer to plead and prove the facts bringing the case within the exempting clause.''

But in that case the plaintiff had by her pleading affirmatively alleged the facts and had taken the burden and introduced her proof, so it was held that as she had assumed the burden of proof and had failed to make out

her case the peremptory instruction was proper and the judgment was affirmed expressly on this ground alone. The burden of proof was properly placed on the defendant under the pleadings here.

3. The rule in this jurisdiction is that if there is any competent, relevant evidence the question is for the jury. The court cannot say that there was no evidence here to take the case to the jury. While there was no express evidence, a fact may be presumed from circumstances. There was evidence here that shortly before his death Dale had a roll of bills. When his body was found there were no bills in his pocket and the silver quarter was lying on the floor near his pocket. This probably had been pulled out of his pocket when the bills were taken out. It is not presumed that a man does a thing idly, and when a man is killed and robbed it may be presumed that the robbery was intended in the killing. In addition to this, Neal, who was in the house and the only person there, gave a false account of how Dale came to his death and hid the pistol with which it was clearly shown Dale was killed. The court cannot therefore say that there was no evidence to take the case to the jury.

4. Objections 4 and 5 will be taken together. While Mary Groves testified that Dale had a "right smart little roll of bills," and when asked how big around it was answered, "It looked like it was that big around" (indicating), the record does not show how big this was. The plaintiff introduced afterwards Hense Dobbins, who testified that about 4 o'clock he paid Dale $6, a $5 bill and a $1 bill; that Dale had some paper money in his pocket and took the money and wrapper in around the other money. On cross-examination he testified that the $6 was rent money paid to him by E. D. Mastin. The evidence stood thus until after the jury had gone out to their room. The defendant then moved the court to allow it to introduce proof in rebuttal, and the jury was recalled. Mastin testified that he did not pay Hense Dobbins any money. Thereupon Dobbins was recalled and said it was the rent money of the house but paid by J. V. McDanniel. After the return of the verdict the defendant got in touch with J. V. McDaniel and produced his affidavit showing that he had not paid Hense Dobbins any money, and making this newly discovered evidence a ground for a new trial.

The newly discovered evidence does more than merely contradict a witness. It goes to the center of the

controversy, for the amount of money which Dale had would have great weight with the jury in determining for what purpose the act in question was done. The testimony of Dobbins that he gave Dale a $5 bill and a $1 bill about 4 o'clock, and that Dale then wrapped these around other bills which he had, went far to sustain the testimony of Mary Groves that "he had a right smart little roll of bills" and it showed that one of the bills was a $5 bill. This testimony may have had great weight with the jury in determining why the shooting was done. In determining whether a new trial should be granted for newly discovered evidence, the court must take into consideration the condition of the proof; for where on all the proof the truth is not made clear, a new trial will be granted more readily for newly discovered evidence than where the facts are clearly established. The court does not now determine that the verdict of the jury is not sustained by the evidence. It reserves this question. It only determines that under the proof a new trial should be granted that all the facts may be more fully gotten before the jury.

Judgment reversed, and cause remanded for a new trial.