## Pacific Mut. Life Ins. Co. v. Meade.

Dec. 15, 1939.

Bruce & Bullitt, Frank C. Malin and Robert Lee Blackwell for appellant.

W. H. Dysard and H. R. Dysard for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The appeal is from a judgment for the plaintiff in a suit to recover on two policies of insurance on the life of Delbert Q. Meade, predicated upon death presumed from the fact that he was unheard of for seven years. Following the joinder of issues, it was stipulated that under their extended insurance provisions a policy for $1,000 remained in force until June 12, 1939, and that the other for $2,000 remained in force until November

7, 1930, and that "the only question left open in this case is whether or not Delbert Q. Meade is dead or alive, and when he died, or whether he is under the law presumed to be dead at all." Meade disappeared on June 2, 1930. Though it is otherwise in some jurisdictions, we hold that the presumption is that the absent person's life ceased or that his death occurred at the expiration of the seven-year period. Commonwealth Life Insurance Company v. Caudill's Adm'r, 266 Ky. 581, 99 S. W. (2d) 745.

There is really no question raised as to the sufficiency of the proof that on June 3, 1937, and up to the time of the trial, May 9, 1938, Meade had been unheard of since June 2, 1930, although diligent efforts to locate him had been made. This authorized a recovery on the $1,000 policy. The contention of the appellant as to that policy is that since the plaintiff had pleaded that the insured's death occurred at the beginning of the seven-year period, or "sometime between June 1, 1930, and July 1, 1930," and then had failed to prove that fact, she was not entitled to recover the proceeds. We do not think the plaintiff was so closely confined. Though the pleading be specific that the absent party died within the period, where it also appropriately alleges that he had not been heard of for seven years, recovery may nevertheless be had if the proof warrants the conclusion that he was presumably dead at the end of the period. No variance between pleading and proof is material unless it misleads a party to his prejudice. Section 129, Civil Code of Practice. Clearly, the plaintiff was entitled to a judgment on the $1,000 policy.

As the defendant's liability on the $2,000 policy terminated on November 7, 1930, because of non-payment of premiums, it was necessary that the plaintiff show the insured's death occurred before that time. An examination of the evidence in some detail must be made and its weight appraised in order to determine its sufficiency to support the verdict.

Meade, for ten years or more, had been employed as a salesman and collector by an Ashland wholesale grocery. He had been so faithful and regular in reporting to the office every morning that when he did not do so on June 2, 1930, the manager made an investigation. Meade's automobile, with his sales slips and other records in it, was found on Winchester Avenue in Ashland,

near the Ventura Hotel, a short distance from the Ohio River and highway bridge. The day before he had collected several hundred dollars from his customers and, according to his practice, would have had it on his person until he turned it in at the office the morning of the second. His family, the American Legion, the police and the Insurance Company made efforts to locate the young man, but never received any tidings of him. From time to time bodies were recovered from the river but none was identified as Meade's. Some of these bodies were so decomposed as to prohibit identification. Meade had never made claim for his bonus or adjusted compensation as a soldier, and the Veterans' Bureau had received no communication from him since he borrowed some money on his certificate in July, 1928.

Meade was about thirty-five years old. He was of good family, of pleasing personality, popular with everyone, and associated with the best people. He was industrious and of good habits; a quiet, home-loving young man. He was devoted to his parents, and especially to his daughter, who was then eight years old. While the testimony all was to the effect that he was devoted to his wife and they got along amicably, there is the record of a suit against him for maintenance—not for divorce— and a garnishment of his wages. It alleged the parties were living apart and charged the husband with nonsupport. It had been filed about seven months before. But the domestic difficulty therein reflected had undoubtedly been smoothed over. Meade had bought an expensive home on which he had paid five or six thousand dollars, and assumed a debt heavier than his income justified. A foreclosure suit had been filed in November, 1927, but no steps had been taken to obtain judgment during the nearly three years. The manager of the grocery company testified that Meade had talked to him about his trouble with his wife and his finances. He owed nobody else anything of consequence and his financial trouble grew out of the debt on his home.

A short time before his disappearance Meade had rented a room in Huntington, West Virginia. The only testimony as to his reasons for doing so was that of his mother-in-law, which was that he had been considering swapping territory with a salesman for the same company. His wife and child had been living with her mother; but it is uncontradicted that from time to time they had stayed with Meade. They had gone to Florida.

about a month before his disappearance, after having been with him a few days in Huntington. He had taken them to the train and kissed them goodbye. On May 30th, three days before he disappeared, Meade wrote his wife an affectionate letter, addressing her as "My Sweetheart." He recalled that it was the first Decoration Day they had been separated since their marriage. He spoke of his loneliness and that he had seen a little girl on the street which made him "lonesome for Betty." In this letter he wrote: "If anything should happen, remember I always loved you." The court sustained objections to questions asked several witnesses, the answer to which would have shown that Meade was in constant fear of being robbed of the money he was collecting every day for his employer and keeping over night; also that there had been recent robberies in the vicinity where his automobile was found. When his wife was notified of his disappearance she immediately returned to Ashland. She and her mother, and perhaps another, went to his room in Huntington, where they found all his clothing, watch and other personal belongings, just like he would have ordinarily left them for his day's work. Pictures of his wife and child sent him from Florida were stuck up on the mirror of his dresser.

Reverting to Meade's financial condition. Tandy Martin had signed his note for $1,200, as surety, in 1929, and had paid it in May, 1930. Meade and his wife had, by a formal writing, assigned to Martin all their right, title and interest in their home. Martin testified in effect that he had been deceived by Meade as he had assumed or believed that the property was otherwise clear of debt. There was no such representation in the writing. He had tried to see Meade recently but he had dodged him.

Not long after Meade's disappearance the grocery company had a warrant of arrest issued for him on the charge of embezzlement, and he was indicted in January, 1931. The prosecution and a reward of $100, offered by the company, stirred the police into renewed activity and they made diligent efforts to locate the man, running down several clues, but could find no trace of him. On the trial of this case the Insurance Company endeavored to prove that Meade had been short in his collections for some time and had absconded. This matter was gone into in detail. There were a number of carbon collection slips introduced, but no other books or records

showing such a shortage. The qualification of the witness testifying on this point was doubtful. The evidence was very indefinite and inconclusive. It showed no more than that Meade had not turned in the collections of the day before. Selbee, the manager, testified that Meade's shortage was approximately the amount of the day's collections, and, so far as he knew, there was no other shortage.

A day or so after Meade's disappearance, a telegram was delivered at his room in Huntington. It seems to have been first turned over to the Grocery Company and then to the police department. The department's file of this case, probably including this telegram, was lost during the flood of 1937, and the oral testimony concerning it is not clear. Selbee first testified that the message was addressed to "Delbert Q. Meade" and that it read: "Will be unable to meet you," and gave a date—"but will be there the following day." It was from some Chicago suburb and referred to some place in Indiana. However, on cross-examination, Selbee qualified his statements by admitting that he may have been mistaken as to the name or the initials of the addressee. The police officer who had possession of the telegram had little recollection of its contents. Though he thought it was signed with a woman's name, he could not definitely say so since, said he, it was hard to determine a man's name from a woman's. The plaintiff's mother-in-law, Mrs. Fitch, and a friend, Mrs. Fuller, testified emphatically that the telegram was addressed to "D. H. Meade" and not "D. Q. Meade" at Huntington. It seems to have been delivered at the house where Delbert Q. Meade lived but did not bear that address. Selbee further testified that upon talking with Mrs. Meade about this telegram, she had remarked that "evidently he had gone to meet a woman he had been very familiar with while he was at the Great Lakes Station in Chicago." It had been thirteen years since Meade was there as a youth of twenty-one or twenty-two years. There is no suggestion or indication in the record other than this remark of his wife showing that he had known any girl or had kept up any acquaintance he may have had then and there. The jury were justified in disregarding this circumstantial item because of its inconclusive nature and the thought that the defendant might have produced the records of the telegraph company and definitely established its theory, but had not done so.

All the foregoing evidence is to be considered on the question of its sufficiency to support the verdict that Meade had died before the lapse of the $2,000 policy on November 7, 1930. The burden of proving this rested upon plaintiff and the arbitrary legal presumption of death arising from his unexplained absence of seven years does not aid her in establishing that fact. Goodier v. Mutual Life Insurance Company, 158 Minn. 1, 196 N. W. 662, 34 A. L. R. 1383; Tyrrell v. Prudential Insurance Company, 109 Vt. 6, 192 A. 184, 115 A. L. R. 392. It is admitted that the presumption was against the plaintiff, for the continuance of life is presumed until the contrary has been established. Morgan v. Big Woods Lumber Company, 198 Ky. 88, 249 S. W. 329; Mutual Life Insurance Company v. Louisville Trust Company, 207 Ky. 654, 269 S. W. 1014; Cole v. Ohio Fuel Oil Company, 229 Ky. 771, 17 S. W. (2d) 1029. But like any other fact death may be established by circumstantial evidence. The collection of facts and the probative significance to be accorded the special circumstances may justify an inference of death on or about a certain date. 8 R. C. L. 713; 16 Am. Jur., Death, Section 26. The jury may have regarded the character, life and situation of Meade as refuting a purpose to desert his home, his family and his friends. While debt may have worried him, it was not pressing, for nothing had been done in the foreclosure suit for nearly three years. He was not shown to have been otherwise financially involved except the claim of Martin, the second mortgagee, and that had hardly progressed to a point which called for so great a sacrifice as running away from everything. He still had a good job and was living in pleasant surroundings. His domestic difficulty apparently was over with. There is nothing to indicate that he was disheartened. Of course, once in awhile a "Dr. Jekyl and Mr. Hyde" existence is uncovered, but it was not in this case, barring whatever suspicion may have been raised by the telegram mentioned. The argument that the warrant and prospective indictment for embezzlement afforded a strong motive for leaving the country loses force by the proof that they were based upon a failure to turn in the collections of the previous day. He was not short in his accounts up to the time of his disappearance. Motive to run away was entirely absent. Sometimes sudden and marked changes do take place in the character and habits of an individual, but that is so

very exceptional as not to interfere with the general presumption that character and habits continue to be the same. The course of experience refutes the theory of such abandonment of all those things dear to a man's life when it is proved that his business, social and domestic relations were of a character like this young man's. The experiences of life are against anyone so situated running away. If there had been a sudden, unexplainable impulse to do so, human nature makes it almost certain that if alive during so long a period—now nine and one-half years—he would have returned or communicated with someone at home.

If he had been running away, he would have been apt to take his automobile and at least some of his clothing other than what he was wearing. This is significant. He evidently had a large sum of money on his person. His practice in this respect made him peculiarly subject to attack. Exposure to specific peril is often of much probative value. The Ohio River, within a few feet of where his automobile was found, afforded a probable safe place for disposing of his body by a robber and may have proved to be his permanent sepulcher.

Fortifying logical deductions of fatality is that diligence of search failed to uncover any clue to his whereabouts. The time element is also important as affording an inference of death shortly before discovery of his disappearance. The inference or presumption of continued existence of any particular fact, including that of life, steadily diminishes in force with a lapse of time. 22 C. J. 86. The probabilities of non-existence drawn from the circumstances increases as the factual presumption decreases.

The case of Tyrrell v. Prudential Insurance Company, supra, is strikingly like the one at bar. The suit was upon two life insurance policies. Extended insurance of the smaller one expired December 31, 1938, and of the larger, September 28, 1932. The insured disappeared October 31, 1927, so in order to recover on the smaller policy it was necessary that the beneficiary establish only his absence without being heard of for seven years, but to recover on the larger policy it was necessary to prove that death had occurred within the seven-year period. The insured had been convicted of a felony and divorced by his wife while in prison. They had remarried when he got out and for several years their do-

mestic life was apparently pleasant. Two children were born to them. His social and financial circumstances were so satisfactory as to make it highly improbable that he would deliberately and permanently desert his home and family. However, the wife sued for divorce in July, 1928, eight months after her husband disappeared, and in her verified petition had charged him with gross and extreme cruelty, and other marital misdoings. A divorce was granted on this petition. In her suit on the insurance policy she explained that she had signed that divorce without knowing its contents and that its purpose was to get title in her name to certain property standing in their joint names. The court pointed to the conflicting presumptions—the one of continued life for seven years and the other of death at the expiration of that period. The circumstantial evidence was held sufficient for the jury to have found that the insured's absence could not be reasonably explained on any other theory than that his death occurred within two years. But the judgment was reversed for erroneous instructions.

In Commonwealth Life Insurance Company v. Caudill's Adm'r, 226 Ky. 581, 99 S. W. (2d) 745; Second Appeal, 276 Ky. 149, 122 S. W. (2d) 989, the beneficiary of an insurance policy undertook to establish the death of the insured at the commencement of the seven-year period. The particular circumstances were that he was last seen in a gambling room with some desperate men and that they had had a fight. A splash was heard in the river then running under or near to the building because of a flood. There were contradictions as to these things and evidence of some peculiar actions on the part of the insured. But we held the evidence sufficient to sustain a verdict of death at that time. See also Mutual Life Insurance Company v. Louisville Trust Company, supra. Other opinions holding evidence of the character produced in this case to be sufficient are Gifford v. Provident Life Insurance Company, 16 Tenn. App. 21, 64 S. W. (2d) 64; Ballinger v. Connecticut Mutual Life Insurance Company, 167 Tenn. 367, 69 S. W. (2d) 1090; Butler v. Supreme Court of I. O. F., 60 Wash. 171, 110 P. 1007; Eklund v. Supreme Council Royal Arcanum, 152 Minn. 20, 187 N. W. 827; Arden v. United Artisans, 124 Or. 225, 264 P. 373; Behlmer v. Grand Lodge, A. O. U. W., 109 Minn. 305, 123 N. W. 1071, 26 L. R. A., N. S., 305; Kansas City Life Insurance Company v. Marshall,

84 Colo. 71, 268 P. 529, 61 A. L. R. 1321. We, therefore, conclude that the evidence is sufficient to sustain the verdict.

We think the court properly refused the instructions offered by the defendant. One of them was that the jury should consider "all the circumstances attending his departure and the reasons, if any, for his absence and then determine from all the evidence whether he was dead or alive when this suit was commenced." The other would have instructed the jury on the presumption of the continuance of Meade's life beyond the date of his disappearance, and that in determining whether he died then the jury could not consider the contrary presumption which thereafter arose at the end of the seven-year period. The first offered instruction would have offended the rule against the court commenting on the evidence and indicating to the jury what weight should be given it. The other is the same character. It is never proper to instruct the jury as to presumptions of law or of fact. Massachusetts Mutual Life Insurance Company v. Bush, 236 Ky. 400, 33 S. W. (2d) 351. The instructions given follow closely those prescribed in the first opinion of Commonwealth Life Insurance Company v. Caudill's Adm'r, supra. The criticism of the language of those instructions draws a distinction without making a difference.

The judgment is affirmed.