## Edwards v. Equitable Life Assur. Soc. of United States.

Jan. 28, 1944.

450

Lawrence C. Jenkins for appellant.

Wm. Marshall Bullitt, Eugene B. Cochran, William Mellor, Bullitt and Middleton for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Reversing.

Under the terms of two policies of group insurance issued by the appellee upon the lives of employees of the Standard Oil Company, Goodloe B. Edwards was insured in the sum of $3,000. Edwards disappeared and has not been heard from since March 30 or 31, 1931. His son as beneficiary prosecutes this suit to recover the insurance upon the ground of presumed death through an absence of seven years, but his right to recover rests upon the sufficiency of the evidence to show that the insured committed suicide at the beginning of the term, that is, on March 30, 1931, while his insurance was in effect. The defendant pleaded affirmatively that its liability had automatically terminated because the insured had ceased to be an employee of the Standard Oil Company when and if he met his death.

The plaintiff recovered a verdict, but it was set aside upon a motion for a new trial. On sustaining the motion the court expressed the opinion that upon the plaintiff's theory that the insured had left his place of work and gone to the river and drowned himself, he had in fact and in law abandoned his employment before he met his death. On the second trial, it was stipulated that the evidence would be the same, and the court directed a verdict for the defendant. It was further stipulated that the transcript of evidence heard on the first trial should be considered and used on this appeal from the second judgment.

For fourteen years Edwards had been the manager of a gasoline service station in Ashland for the Standard Oil Company. His employment was indefinite as to term and compensation was on a commission basis. He had no regular hours to work and was free to come and go. He had become a liquor addict and in later months drank

heavily. His business had fallen off materially. He and his son lived in a rooming house when the latter was not in Lexington attending the University. Several days before he disappeared he had thrown the bedding on the floor, pulled back the rug, left the dresser drawers open and otherwise created disorder in the room, the like of which was contrary to his usual quiet and tidiness. Several times while shaving he was heard to be cursing himself as he looked in the mirror. He became greatly depressed and worried over the falling off of business and the prospect of not being able "to hold out" until his son got through college. In the afternoon of March 30th, he unsuccessfully tried to cash a check for $400. Later he got a $50 check cashed, payment of which was declined by the bank. That was the first time Edwards had ever defaulted in anything owing the store where it was cashed. Luster Oxley, then a high school student, worked for him at the filling station on Saturdays and after school. He testified that Edwards was unusually restless and nervous that afternoon and walked around aimlessly without ever sitting down. He told Oxley that his business was bad; that he felt so bad he did not see how he was going to make it; that he would not need him any longer; that he was going to end everything before he closed the station that night. Oxley did not pay serious attention to this threat because Edwards was then very much intoxicated. He had gone to his room, where his landlady heard him moving about and apparently tearing up some papers. He left there without his suit case or other receptacle, and returned to the station shortly after 5 o'clock. Oxley left in a few minutes. Edwards was never seen afterward, unless at Maysville, as we shall describe. The station was three or four blocks from the Ohio River.

About 7 o'clock that evening, Earl Weaver, an auditor for the Oil Company, went by the station to take up the cash (of which there had been very little in recent weeks) and found the lights had not been turned on. Edwards was not there. His desk had been partially straightened up and the keys were lying on it. Finding the keys loses its apparent significance through the testimony of Oxley that it was the custom to leave them there. There was no money but some "charge tickets" were in a desk drawer. Weaver had expected to check the station's accounts the next day. Edwards had been lately padding his inventories and accounts a little, but

nothing had been done about it except to admonish him and to straighten up his accounts. It developed that at the time of his disappearance he owed the company around $60, but had commissions coming to him of about $90.

The next day, March 31st, Edwards' son, a student at the University in Lexington, received a letter from his father enclosing $70 in cash, and saying that he did not know how he could send him any more; that by the time he got the letter the river would have him, and that he wanted his son to take care of his mother. The letter was postmarked at Ashland on March 30th. The son went to Ashland as soon as he could and began a search for his father. He found all of his clothing and effects in his room, except those he was wearing, and his coveralls hanging in their usual place at the service station. The testimony of a witness that he had seen Edwards in Maysville, eighty miles away, on March 30th or 31st, is not persuasive. At least its probative value was for the jury. Commonwealth Life Ins. Co. v. Wood's Adm'x, 263 Ky. 361, 92 S. W. (2d) 351.

We think the evidence sufficient to show the degree and character of diligence required before it can be said that a missing person is dead as a presumption of law. In this state it is held in cases of this kind that death is presumed to have occurred at the end of the seven-year period, but that it may be alleged and proved that it occurred in the beginning. Commonwealth Life Ins. Co. v. Caudill's Adm'r, 266 Ky. 581, 99 S. W. (2d) 745; second appeal 276 Ky. 149, 122 S. W. (2d) 989. We have held that a letter written by the absent one expressing an intention to commit suicide at once is admissible as part of the res gestae to fix the time of his death, and that it is in itself some evidence that he had carried out his purpose. Mutual Life Ins. Co. v. Louisville Trust Co., Adm'r, 207 Ky. 654, 269 S. W. 1014. See also annotation 34 A. L. R. 1398. Proof of death at the beginning of the period of absence was sufficiently established by the circumstances in Commonwealth Life Ins. Co. v. Caudill's Adm'r, supra, and Pacific Mutual Life Ins. Co. v. Meade, 281 Ky. 36, 134 S. W. (2d) 960.

We are of opinion the evidence was sufficient to establish Edwards' death not only at the beginning of the seven-year period antedating the suit, but shortly after he left his service station in the late afternoon or early

evening of March 30, 1931. The appellee suggests otherwise but does not press the point. It does insist that its liability had ended whenever he did meet his death.

The policies and the certificates issued to the employee provided that the insurance automatically ceased and determined immediately upon the termination of the insured's employment without regard to the cause of such termination (with certain inapplicable exceptions) unless continued under an individual conversion option. Precise and similar provisions have given rise to a number of cases, each varying with the circumstances. Usually the question was whether there had been a permanent discharge or voluntary quitting of the job or temporary lay-off. Annotations 50 A. L. R. 1286; 55 A. L. R. 1245; 63 A. L. R. 1034; 85 A. L. R. 1467; 105 A. L. R. 419. The appellee insists that the insured, Edwards, voluntarily terminated his employment by abandoning his place of work so that he was not covered when he met his death.

The question is as narrow as it is unusual. We must examine it under the influence of our uniform rule of construing insurance contracts liberally in favor of the insured or beneficiary. We have so viewed similar provisions in group policies where the issues were whether there had been a temporary or permanent termination of employment or cessation by reason of disability incurred during the coverage. Equitable Life Assurance Society v. Greene, 227 Ky. 431, 13 S. W. (2d) 279; Prudential Insurance Co. v. Sweet, 253 Ky. 643, 69 S. W. (2d) 748; Prudential Ins. Co. v. Cox, 254 Ky. 98, 71 S. W. (2d) 31; Prudential Ins. Co. v. Bridgman, 256 Ky. 575, 76 S. W. (2d) 639. There are two other important considerations which have their influence. One is that the provision that the termination of employment of the insured vitiated the policy as to him was a condition subsequent and not a condition precedent, so the burden of proof as to the happening of the event or condition was upon the insurer. Sturmer v. Travelers Ins. Co., 279 Ill. App. 607; Peters v. Aetna Life Ins. Co., 279 Mich. 663, 273 N. W. 307; Compare Massachusetts Bonding & Ins. Co. v. Dale, 244 Ky. 50, 50 S. W. (2d) 40. The other consideration is that the contract provided that after termination of the employment the insured had the unrestricted right for thirty-one days to convert the insurance and have the insurance company issue

to him an individual policy. Some courts hold this provision is the equivalent of a thirty-one day period of grace, during which the employee remains insured, for there could be no conversion of an expired or terminated policy. Annotations 145 A. L. R. 951. We do not construe the provision that way (Equitable Life Assurance Society v. Yates, 288 Ky. 309, 156 S. W. (2d) 128), but the closeness of that question cannot but have some influence in determining this one where there is so narrow a margin between liability and nonliability.

"Termination of employment" and like terms refer to the existence of the relationship of employer and employee, and to the status of the deceased in that regard at the time of his death, so as will make applicable and effective all parts of the insurance contract. What the employer did in later marking its records that Edwards had ceased his employment on March 30, 1931, cannot affect the status. Emerick v. Connecticut General Life Ins. Co., 120 Conn. 60, 179 A. 335, 337, 105 A. L. R. 413; Ambrose v. Metropolitan Life Ins. Co., 10 A. (2d) 479, 18 N. J. Misc. 42. Furthermore, the terms mean something more than that the employee stopped work or the employer stopped paying him. Ordinarily that would exist in case of sickness or vacation or layoff. As said in Peters v. Aetna Life Ins. Co., 279 Mich. 663, 273 N. W. 308: "The clause must mean a complete severance of the relationship of employer and employee by positive act on the part of either or both. In the absence of conclusive evidence, the character of the cessation of work must be found from the attendant circumstances. Powell v. Equitable Life Assurance Society, 173 S. C. 50, 174 S. E. 649; Ziegler v. Equitable Life Assurance Society, 219 Iowa 872, 259 N. W. 769; Ozanich v. Metropolitan Life Ins. Co., 119 Pa. Super. 52, 180 A. 67, 576."

Of course, under such definition an employment may be terminated by the employee merely quitting and abandoning it as well as by agreement or discharge. In such a case the severance of the relationship is accomplished by both conduct and intention, for one factor without the other would not be effective, particularly if, as here, the employer had no knowledge of what was being or had been done. So far as this record shows Edwards could have closed the service station for an indefinite time and still have been an employee until dis-

charged and so notified. The intention or mental attitude of a person with respect to an act done by him as by changing his status in a particular situation or relationship is a factual matter to be determined by a jury from a consideration of all the circumstances and inferences where it is not conclusively manifested. Commonwealth v. Wiggins, 165 Ky. 73, 176 S. W. 946; City of Ashland v. City of Catlettsburg, 172 Ky. 364, 189 S. W. 454.

Was it Edwards' intention to quit his life or quit his job? Who can doubt that his mind was centered on his tragic purpose and that the least of his thoughts was the abandonment of his employment? The attendant circumstances afford reasonable inference that his sole purpose was to commit suicide and end it all, as he stated he was going to do, and that quite early. Without the intention to quit, his employment could not have terminated except by his death, for his act in and of itself did not establish a dissolution of the relationship. Had he gone to the river and then changed his mind and gone to his room for the night and returned to his work the next morning, would it have been said he had terminated his employment? Had he shot and killed himself at the station under the same circumstances, we suppose no question would have been raised as to his insured status; or even had he done so at the river side a few hours later. Strictly speaking, in any of the supposed cases he would have abandoned his employment, but it could not be said he was not covered by the insurance. The provision as to termination of the insurance coverage must be given an ordinary and realistic construction, or as understood in its ordinary and popular sense. Certainly the insurance company is not entitled to a literal or strict interpretation or application. The proverbial "man in the street" or the hypothetical "average man" would certainly have said he was an employee of the Standard Oil Company if his body had been found during the night. Doubless he would say so under the actual conditions. It is only the indefiniteness of the time of death that raises the question. The jury on the first trial had a substantial basis for finding, in effect, that he had met death soon after he left the station, for no one saw him after Oxley, his helper, left him there about half past five o'clock that afternoon. As we have said, the jury had the right to discount the unsatisfactory testimony that Edwards was in Maysville the next day.

We would not be so morbid or callous as to say that under the policies an employee had a reasonable time in which to commit suicide after leaving his job. But we think that if the circumstances show that the employee left his place of work with the intention of taking his life without delay or as soon as his purpose could be effected, and did so in fact, then within the spirit and intent of the insurance contract he was covered by its terms. Otherwise, the court would be writing anti-suicide clauses into the contracts, which the company itself never put in them, and nullifying the provision that the policies were incontestable one year from date except for nonpayment of the premiums or violation of the conditions relating to military or naval service in time of war.

On the first trial the case was submitted under instructions perhaps more favorable to the defendant than it was entitled to. The ground upon which the court sustained the defendant's motion for a new trial was only that under the evidence the deceased's employment had terminated as a matter of law. It is now claimed that upon that ground and also the giving of an erroneous instruction which permitted the jury to find too much interest, the judgment should be affirmed. We are not required sua sponte to search the record for any other ground of error.

The policies provide that the insurance was payable "upon receipt of due proof of death." The plaintiff alleged that such proof had been furnished before the commencement of the action and the allegation was denied. There was no evidence on the issue. The absence of evidence of the receipt of proof of death, however, was not insisted upon. The court instructed the jury that if they found for the plaintiff they should do so in the sum of $3,000, with interest from March 30, 1931. The verdict was accordingly. The bill of exceptions does not show that any exception was taken to the giving of any of the instructions by either party, although the defendant stated in its motion for a new trial that the giving of each instruction was error.

Where the amount to which the beneficiary is entitled has been wrongfully withheld by the insurer after payment is proved to be due, interest on such amount is chargeable by way of damages. The amount is to be calculated from the time when it was due and payable.

In this case it was upon receipt of proofs of death. Since the company denied liability and refused payment, proof of death was unnecessary. In view of these circumstances, we are of opinion that interest was allowable only from the date of the commencement of the action. Martin v. Provident Life & Acci. Ins. Co., 242 Ky. 667, 47 S. W. (2d) 524; Prudential Ins. Co. v. Cox, 254 Ky. 98, 71 S. W. (2d) 31; Prudential Ins. Co. v. Bridgman, 256 Ky. 575, 76 S. W. (2d) 639; Cogsdill v. Metropolitan Life Ins. Co., 158 S. C. 371, 155 S. E. 747.

As the time from which interest in the present case should be calculated is purely a matter of law, the instruction was erroneous in submitting it in connection with the principal sum to be awarded if the verdict should be for the plaintiff. But it was a matter which the court could and should have dealt with in the judgment irrespective of the verdict. 64 C. J. 1100; Metropolitan Life Ins. Co. v. Sehlhorst, 53 S. W. 524, 21 Ky. Law Rep. 912; Hack v. Lashley, 197 Ky. 117, 245 S. W. 851. We are of opinion, therefore, that instead of setting aside the first judgment entirely the court should have corrected it to allow interest from the filing of the suit.

The judgment appealed from is reversed and the case remanded with directions to reinstate the judgment on the verdict in the first trial modified with respect to the interest.